## SOLEM, WARDEN, SOUTH DAKOTA STATE PENITENTIARY *v.* HELM

No. 82–492.   Argued March 29, 1983—Decided June 28, 1983

278

*Mark V. Meierhenry*, Attorney General of South Dakota, argued the cause for petitioner. With him on the briefs was *Grant Gormley*, Assistant Attorney General.

*John J. Burnett*, by appointment of the Court, 459 U. S. 1100, argued the cause and filed a brief for respondent.

JUSTICE POWELL delivered the opinion of the Court.

The issue presented is whether the Eighth Amendment proscribes a life sentence without possibility of parole for a seventh nonviolent felony.

I

By 1975 the State of South Dakota had convicted respondent Jerry Helm of six nonviolent felonies. In 1964, 1966, and 1969 Helm was convicted of third-degree burglary.[1] In 1972

---

[1] In 1969 third-degree burglary was defined in at least two sections of the South Dakota criminal code:

"A person breaking into any dwelling house in the nighttime with intent to commit a crime but under such circumstances as do not constitute burglary in the first degree, is guilty of burglary in the third degree." S. D. Comp. Laws Ann. § 22–32–8 (1967) (repealed 1976).

"A person breaking or entering at any time any building within the curtilage of a dwelling house but not forming a part thereof, or any building or part of any building, booth, tent, railroad car, vessel, vehicle as defined in § 32–14–1, or any structure or erection in which any property is kept, with

he was convicted of obtaining money under false pretenses.[2] In 1973 he was convicted of grand larceny.[3] And in 1975 he was convicted of third-offense driving while intoxicated.[4] The record contains no details about the circumstances of any of these offenses, except that they were all nonviolent, none was a crime against a person, and alcohol was a contributing factor in each case.

---

intent to commit larceny or any felony, is guilty of burglary in the third degree." S. D. Comp. Laws Ann. § 22–32–9 (1967) (repealed 1976).

In 1964 and 1966 the third-degree burglary definition was essentially the same. See S. D. Code § 13.3703 (1939 ed., Supp. 1960); 1965 S. D. Laws, ch. 32. Third-degree burglary was punishable by "imprisonment in the state penitentiary for any term not exceeding fifteen years." S. D. Comp. Laws Ann. § 22–32–10 (1967) (previously codified at S. D. Code § 13.3705(3) (1939)) (repealed 1976).

[2] In 1972 the relevant statute provided:

"Every person who designedly, by color or aid of any false token or writing, or other false pretense, . . . obtains from any person any money or property . . . is punishable by imprisonment in the state penitentiary not exceeding three years or in a county jail not exceeding one year, or by a fine not exceeding three times the value of the money or property so obtained, or by both such fine and imprisonment." S. D. Comp. Laws Ann. § 22–41–4 (1967) (repealed 1976).

[3] In 1973 South Dakota defined "larceny" as "the taking of personal property accomplished by fraud or stealth and with intent to deprive another thereof." S. D. Comp. Laws Ann. § 22–37–1 (1967) (repealed 1976). Grand larceny and petit larceny were distinguished as follows:

"Grand larceny is larceny committed in any of the following cases:

"(1) When the property taken is of a value exceeding fifty dollars;

"(2) When such property, although not of a value exceeding fifty dollars, is taken from the person of another;

"(3) When such property is livestock.

"Larceny in other cases is petit larceny." S. D. Comp. Laws Ann. § 22–37–2 (1967) (repealed 1976).

Grand larceny was then punishable by "imprisonment in the state penitentiary not exceeding ten years or by imprisonment in the county jail not exceeding one year." S. D. Comp. Laws Ann. § 22–37–3 (1967) (repealed 1976).

[4] A third offense of driving while under the influence of alcohol is a felony in South Dakota. S. D. Codified Laws § 32–23–4 (1976). See 1973 S. D. Laws, ch. 195, § 7 (enacting version of § 32–23–4 in force in 1975).

In 1979 Helm was charged with uttering a "no account" check for $100.[5] The only details we have of the crime are those given by Helm to the state trial court:

> "'I was working in Sioux Falls, and got my check that day, was drinking and I ended up here in Rapid City with more money than I had when I started. I knew I'd done something I didn't know exactly what. If I would have known this, I would have picked the check up. I was drinking and didn't remember, stopped several places.'" *State* v. *Helm*, 287 N. W. 2d 497, 501 (S. D. 1980) (Henderson, J., dissenting) (quoting Helm).

After offering this explanation, Helm pleaded guilty.

Ordinarily the maximum punishment for uttering a "no account" check would have been five years' imprisonment in the state penitentiary and a $5,000 fine. See S. D. Comp. Laws Ann. § 22–6–1(6) (1967 ed., Supp. 1978) (now codified at S. D. Codified Laws § 22–6–1(7) (Supp. 1982)). As a result of his criminal record, however, Helm was subject to South Dakota's recidivist statute:

> "When a defendant has been convicted of at least three prior convictions [sic] in addition to the principal felony, the sentence for the principal felony shall be enhanced to the sentence for a Class 1 felony." S. D. Codified Laws § 22–7–8 (1979) (amended 1981).

The maximum penalty for a "Class 1 felony" was life imprisonment in the state penitentiary and a $25,000 fine.[6] S. D.

---

[5] The governing statute provides, in relevant part:

"Any person who, for himself or as an agent or representative of another for present consideration with intent to defraud, passes a check drawn on a financial institution knowing at the time of such passing that he or his principal does not have an account with such financial institution, is guilty of a Class 5 felony." S. D. Codified Laws § 22–41–1.2 (1979).

[6] When Helm was sentenced in April 1979, South Dakota law classified felonies as follows:

"Except as otherwise provided by law, felonies are divided into the following seven classes which are distinguished from each other by the re-

Comp. Laws Ann. § 22–6–1(2) (1967 ed., Supp. 1978) (now codified at S. D. Codified Laws § 22–6–1(3) (Supp. 1982)). Moreover, South Dakota law explicitly provides that parole is unavailable: "A person sentenced to life imprisonment is not eligible for parole by the board of pardons and paroles." S. D. Codified Laws § 24–15–4 (1979). The Governor[7] is authorized to pardon prisoners, or to commute their sentences, S. D. Const., Art. IV, § 3, but no other relief from sentence is available even to a rehabilitated prisoner.

Immediately after accepting Helm's guilty plea, the South Dakota Circuit Court sentenced Helm to life imprisonment under § 22–7–8. The court explained:

> " 'I think you certainly earned this sentence and certainly proven that you're an habitual criminal and the record

---

spective maximum penalties hereinafter set forth which are authorized upon conviction:

"(1) Class A felony: life imprisonment in the state penitentiary. A lesser sentence may not be given for a Class A felony;

"(2) Class 1 felony: life imprisonment in the state penitentiary. In addition, a fine of twenty-five thousand dollars may be imposed;

"(3) Class 2 felony: twenty-five years imprisonment in the state penitentiary. In addition, a fine of twenty-five thousand dollars may be imposed;

"(4) Class 3 felony: fifteen years imprisonment in the state penitentiary. In addition, a fine of fifteen thousand dollars may be imposed;

"(5) Class 4 felony: ten years imprisonment in the state penitentiary. In addition, a fine of ten thousand dollars may be imposed;

"(6) Class 5 felony: five years imprisonment in the state penitentiary. In addition, a fine of five thousand dollars may be imposed; and

"(7) Class 6 felony: two years imprisonment in the state penitentiary or a fine of two thousand dollars, or both.

"Nothing in this section shall limit increased sentences for habitual criminals . . . .

"Except in cases where punishment is prescribed by law, every offense declared to be a felony and not otherwise classified is a Class 6 felony." S. D. Comp. Laws Ann. § 22–6–1 (1967 ed., Supp. 1978) (amended 1979 and 1980).

[7] The Board of Pardons and Paroles is authorized to make recommendations to the Governor, S. D. Codified Laws §§ 24–14–1, 24–14–5 (1979);

would indicate that you're beyond rehabilitation and that the only prudent thing to do is to lock you up for the rest of your natural life, so you won't have further victims of your crimes, just be coming back before Courts. You'll have plenty of time to think this one over.'" *State* v. *Helm, supra,* at 500 (Henderson, J., dissenting) (quoting South Dakota Circuit Court, Seventh Judicial Circuit, Pennington County (Parker, J.)).

The South Dakota Supreme Court, in a 3–2 decision, affirmed the sentence despite Helm's argument that it violated the Eighth Amendment. *State* v. *Helm, supra.*

After Helm had served two years in the state penitentiary, he requested the Governor to commute his sentence to a fixed term of years. Such a commutation would have had the effect of making Helm eligible to be considered for parole when he had served three-fourths of his new sentence. See S. D. Codified Laws § 24–15–5(3) (1979). The Governor denied Helm's request in May 1981. App. 26.

In November 1981, Helm sought habeas relief in the United States District Court for the District of South Dakota. Helm argued, among other things, that his sentence constituted cruel and unusual punishment under the Eighth and Fourteenth Amendments. Although the District Court recognized that the sentence was harsh, it concluded that this Court's recent decision in *Rummel* v. *Estelle,* 445 U. S. 263 (1980), was dispositive. It therefore denied the writ.

The United States Court of Appeals for the Eighth Circuit reversed. 684 F. 2d 582 (1982). The Court of Appeals noted that *Rummel* v. *Estelle* was distinguishable. Helm's sentence of life without parole was qualitatively different from Rummel's life sentence with the prospect of parole because South Dakota has rejected rehabilitation as a goal of

---

S. D. Executive Order 82–04 (Apr. 12, 1982), but the Governor is not bound by the recommendation, § 24–14–5.

the criminal justice system. The Court of Appeals examined the nature of Helm's offenses, the nature of his sentence, and the sentence he could have received in other States for the same offense. It concluded, on the basis of this examination, that Helm's sentence was "grossly disproportionate to the nature of the offense." 684 F. 2d, at 587. It therefore directed the District Court to issue the writ unless the State resentenced Helm. *Ibid.*

We granted certiorari to consider the Eighth Amendment question presented by this case. 459 U. S. 986 (1982). We now affirm.

## II

The Eighth Amendment declares: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The final clause prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed.

## A

The principle that a punishment should be proportionate to the crime is deeply rooted and frequently repeated in common-law jurisprudence. In 1215 three chapters of Magna Carta were devoted to the rule that "amercements"[8] may not be excessive.[9] And the principle was repeated and extended in the First Statute of Westminster, 3 Edw. I, ch. 6

---

[8] An amercement was similar to a modern-day fine. It was the most common criminal sanction in 13th-century England. See 2 F. Pollock & F. Maitland, The History of English Law 513–515 (2d ed. 1909).

[9] Chapter 20 declared that "[a] freeman shall not be amerced for a small fault, but after the manner of the fault; and for a great crime according to the heinousness of it." See 1 S. D. Codified Laws, p. 4 (1978) (translation of Magna Carta). According to Maitland, "there was no clause in Magna Carta more grateful to the mass of the people . . . ." F. Maitland, Pleas of the Crown for the County of Gloucester xxxiv (1884). Chapter 21 granted the same rights to the nobility, and chapter 22 granted the same rights to the clergy.

(1275). These were not hollow guarantees, for the royal courts relied on them to invalidate disproportionate punishments. See, *e. g.*, *Le Gras* v. *Bailiff of Bishop of Winchester*, Y. B. Mich. 10 Edw. II, pl. 4 (C. P. 1316), reprinted in 52 Selden Society 3 (1934). When prison sentences became the normal criminal sanctions, the common law recognized that these, too, must be proportional. See, *e. g.*, *Hodges* v. *Humkin*, 2 Bulst. 139, 140, 80 Eng. Rep. 1015, 1016 (K. B. 1615) (Croke, J.) ("imprisonment ought always to be according to the quality of the offence").

The English Bill of Rights repeated the principle of proportionality in language that was later adopted in the Eighth Amendment: "excessive Baile ought not to be required nor excessive Fines imposed nor cruell and unusuall Punishments inflicted." 1 Wm. & Mary, sess. 2, ch. 2 (1689). Although the precise scope of this provision is uncertain, it at least incorporated "the longstanding principle of English law that the punishment . . . should not be, by reason of its excessive length or severity, greatly disproportionate to the offense charged." R. Perry, Sources of Our Liberties 236 (1959); see 4 W. Blackstone, Commentaries *16–*19 (1769) (hereafter Blackstone); see also *id.*, at *16–*17 (in condemning "punishments of unreasonable severity," uses "cruel" to mean severe or excessive). Indeed, barely three months after the Bill of Rights was adopted, the House of Lords declared that a "fine of thirty thousand pounds, imposed by the court of King's Bench upon the earl of Devon was excessive and exorbitant, against magna charta, the common right of the subject, and the law of the land." *Earl of Devon's Case*, 11 State Tr. 133, 136 (1689).

When the Framers of the Eighth Amendment adopted the language of the English Bill of Rights,[10] they also adopted the

---

[10] The Eighth Amendment was based directly on Art. I, § 9, of the Virginia Declaration of Rights (1776), authored by George Mason. He, in turn, had adopted verbatim the language of the English Bill of Rights. There can be no doubt that the Declaration of Rights guaranteed at least

English principle of proportionality. Indeed, one of the consistent themes of the era was that Americans had all the rights of English subjects. See, *e. g.*, 1 J. Continental Cong. 83 (W. Ford ed. 1904) (Address to the People of Great Britain, Sept. 5, 1774) ("we claim all the benefits secured to the subject by the English constitution"); 1 American Archives 700 (4th series 1837) (Georgia Resolutions, Aug. 10, 1774) ("his Majesty's subjects in *America* . . . are entitled to the same rights, privileges, and immunities with their fellow-subjects in *Great Britain*"). Thus our Bill of Rights was designed in part to ensure that these rights were preserved. Although the Framers may have intended the Eighth Amendment to go beyond the scope of its English counterpart, their use of the language of the English Bill of Rights is convincing proof that they intended to provide at least the same protection—including the right to be free from excessive punishments.

## B

The constitutional principle of proportionality has been recognized explicitly in this Court for almost a century.[11] In the

the liberties and privileges of Englishmen. See A. Nevins, The American States During and After the Revolution 146 (1924) (Declaration of Rights "was a restatement of English principles—the principles of Magna Charta . . . and the Revolution of 1688"); A. Howard, The Road from Runnymede: Magna Carta and Constitutionalism in America 205–207 (1968). As Mason himself had explained: "We claim Nothing but the Liberties & Privileges of Englishmen, in the same Degree, as if we had still continued among our Brethren in Great Britain . . . . We have received [these rights] from our Ancestors, and, with God's Leave, we will transmit them, unimpaired to our Posterity." Letter to "the Committee of Merchants in London" (June 6, 1766), reprinted in 1 The Papers of George Mason 71 (R. Rutland ed. 1970); cf. the Fairfax County Resolves (1774) (colonists entitled to all "Privileges, Immunities and Advantages" of the English Constitution), reprinted in 1 The Papers of George Mason 201.

[11] In *O'Neil* v. *Vermont,* 144 U. S. 323 (1892), the defendant had been convicted of 307 counts of "selling intoxicating liquor without authority," and sentenced to a term of over 54 years. The majority did not reach

leading case of *Weems* v. *United States*, 217 U. S. 349 (1910), the defendant had been convicted of falsifying a public document and sentenced to 15 years of *"cadena temporal,"* a form of imprisonment that included hard labor in chains and permanent civil disabilities. The Court noted that "it is a precept of justice that punishment for crime should be graduated and proportioned to offense," *id.*, at 367, and held that the sentence violated the Eighth Amendment. The Court endorsed the principle of proportionality as a constitutional standard, see, *e. g.*, *id.*, at 372–373, and determined that the sentence before it was "cruel in its excess of imprisonment," *id.*, at 377, as well as in its shackles and restrictions.

The Court next applied the principle to invalidate a criminal sentence in *Robinson* v. *California*, 370 U. S. 660 (1962).[12] A 90-day sentence was found to be excessive for the crime of being "addicted to the use of narcotics." The Court explained that "imprisonment for ninety days is not, in the abstract, a punishment which is either cruel or unusual." *Id.*, at 667. Thus there was no question of an inherently barbaric punishment. "But the question cannot be considered in the abstract. Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." *Ibid.*

---

O'Neil's contention that this sentence was unconstitutional, for he did not include the point in his assignment of errors or in his brief. *Id.*, at 331. Furthermore, the majority noted that the Eighth Amendment "does not apply to the States." *Id.*, at 332. Accordingly the Court dismissed the writ of error for want of a federal question. *Id.*, at 336–337. The dissent, however, reached the Eighth Amendment question, observing that it "is directed . . . against all punishments which by their excessive length or severity are greatly disproportioned to the offences charged." *Id.*, at 339–340 (Field, J., dissenting).

[12] Members of the Court continued to recognize the principle of proportionality in the meantime. See, *e. g.*, *Trop* v. *Dulles*, 356 U. S. 86, 100 (1958) (plurality opinion); *id.*, at 111 (BRENNAN, J., concurring); *id.*, at 125–126 (Frankfurter, J., dissenting).

Most recently, the Court has applied the principle of proportionality to hold capital punishment excessive in certain circumstances. *Enmund* v. *Florida*, 458 U. S. 782 (1982) (death penalty excessive for felony murder when defendant did not take life, attempt to take life, or intend that a life be taken or that lethal force be used); *Coker* v. *Georgia*, 433 U. S. 584, 592 (1977) (plurality opinion) ("sentence of death is grossly disproportionate and excessive punishment for the crime of rape"); *id.*, at 601 (POWELL, J., concurring in judgment in part and dissenting in part) ("ordinarily death is disproportionate punishment for the crime of raping an adult woman"). And the Court has continued to recognize that the Eighth Amendment proscribes grossly disproportionate punishments, even when it has not been necessary to rely on the proscription. See, *e. g.*, *Hutto* v. *Finney*, 437 U. S. 678, 685 (1978); *Ingraham* v. *Wright*, 430 U. S. 651, 667 (1977); *Gregg* v. *Georgia*, 428 U. S. 153, 171–172 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.); cf. *Hutto* v. *Davis*, 454 U. S. 370, 374, and n. 3 (1982) *(per curiam)* (recognizing that some prison sentences may be constitutionally disproportionate); *Rummel* v. *Estelle*, 445 U. S., at 274, n. 11 (same).[13]

## C

There is no basis for the State's assertion that the general principle of proportionality does not apply to felony prison sentences.[14] The constitutional language itself suggests no

---

[13] The dissent charges that "the Court blithely discards any concept of *stare decisis.*" *Post*, at 304; cf. *post*, at 305, 311–312, 317. On the contrary, our decision is entirely consistent with this Court's prior cases—including *Rummel* v. *Estelle*. See n. 32, *infra*. It is rather the dissent that would discard prior precedent. Its assertion that the Eighth Amendment establishes only a narrow principle of proportionality is contrary to the entire line of cases cited in the text.

[14] According to *Rummel* v. *Estelle*, "*one could argue* without fear of contradiction by any decision of this Court that for crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms

exception for imprisonment. We have recognized that the Eighth Amendment imposes "parallel limitations" on bail, fines, and other punishments, *Ingraham* v. *Wright, supra*, at 664, and the text is explicit that bail and fines may not be excessive. It would be anomalous indeed if the lesser punishment of a fine and the greater punishment of death were both subject to proportionality analysis, but the intermediate punishment of imprisonment were not. There is also no historical support for such an exception. The common-law principle incorporated into the Eighth Amendment clearly applied to prison terms. See *Hodges* v. *Humkin*, 2 Bulst. 139, 80 Eng. Rep. 1015 (K. B. 1615). And our prior cases have recognized explicitly that prison sentences are subject to proportionality analysis. See, *e. g.*, *Weems, supra*, at 377; cf. *Hutto* v. *Finney, supra*, at 685 ("Confinement in a prison . . . is a form of punishment subject to scrutiny under Eighth Amendment standards").

When we have applied the proportionality principle in capital cases, we have drawn no distinction with cases of imprisonment. See *Gregg* v. *Georgia, supra*, at 176 (opinion of Stewart, POWELL, and STEVENS, JJ.). It is true that the "penalty of death differs from all other forms of criminal punishment, not in degree but in kind." *Furman* v. *Georgia*, 408 U. S. 238, 306 (1972) (Stewart, J., concurring). As a result, "our decisions [in] capital cases are of limited assistance in deciding the constitutionality of the punishment" in a noncapital case. *Rummel* v. *Estelle*, 445 U. S., at 272. We agree, therefore, that, "[o]utside the context of capital punishment, *successful* challenges to the proportionality of par-

of imprisonment in a state penitentiary, the length of sentence actually imposed is purely a matter of legislative prerogative." 445 U. S., at 274 (emphasis added). The Court did not adopt the standard proposed, but merely recognized that the argument was possible. To the extent that the State—or the dissent, see *post*, at 307—makes this argument here, we find it meritless.

ticular sentences [will be] exceedingly rare," [15] *ibid.* (emphasis added); see *Hutto* v. *Davis, supra,* at 374.   This does not mean, however, that proportionality analysis is entirely inapplicable in noncapital cases.

In sum, we hold as a matter of principle that a criminal sentence must be proportionate to the crime for which the defendant has been convicted.   Reviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals.[16]   But no penalty is *per se* constitutional.   As the Court noted in *Robinson* v. *California,* 370 U. S., at 667, a single day in prison may be unconstitutional in some circumstances.

## III

### A

When sentences are reviewed under the Eighth Amendment, courts should be guided by objective factors that our cases have recognized.[17]   First, we look to the gravity of the

---

[15] In *Enmund* v. *Florida,* 458 U. S. 782 (1982), for example, the Court found the death penalty to be excessive for felony murder in the circumstances of that case.   But clearly no sentence of imprisonment would be disproportionate for Enmund's crime.

[16] Contrary to the dissent's suggestions, *post,* at 305, 315, we do not adopt or imply approval of a general rule of appellate review of sentences. Absent specific authority, it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence; rather, in applying the Eighth Amendment the appellate court decides only whether the sentence under review is within constitutional limits.   In view of the substantial deference that must be accorded legislatures and sentencing courts, a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate.

[17] The dissent concedes—as it must—that some sentences of imprisonment are so disproportionate that they are unconstitutional under the Cruel and Unusual Punishments Clause.   *Post,* at 311, n. 3; cf. *post,* at 310, n. 2.   It offers no guidance, however, as to how courts are to judge these admittedly rare cases.   We reiterate the objective factors that our cases

offense and the harshness of the penalty.   In *Enmund*, for example, the Court examined the circumstances of the defendant's crime in great detail.   458 U. S., at 797–801. In *Coker* the Court considered the seriousness of the crime of rape, and compared it to other crimes, such as murder.   433 U. S., at 597–598 (plurality opinion); *id.*, at 603 (POWELL, J., concurring in judgment in part and dissenting in part).   In *Robinson* the emphasis was placed on the nature of the "crime."   370 U. S., at 666–667.   And in *Weems*, the Court's opinion commented in two separate places on the pettiness of the offense.   217 U. S., at 363 and 365.   Of course, a court must consider the severity of the penalty in deciding whether it is disproportionate.   See, *e. g.*, *Coker*, 433 U. S., at 598 (plurality opinion); *Weems*, 217 U. S., at 366–367.

Second, it may be helpful to compare the sentences imposed on other criminals in the same jurisdiction.   If more serious crimes are subject to the same penalty, or to less serious penalties, that is some indication that the punishment at issue may be excessive.   Thus in *Enmund* the Court noted that all of the other felony murderers on death row in Florida were more culpable than the petitioner there.   458 U. S., at 795–796.   The *Weems* Court identified an impressive list of more serious crimes that were subject to less serious penalties.   217 U. S., at 380–381.

Third, courts may find it useful to compare the sentences imposed for commission of the same crime in other jurisdic-

---

have recognized.   See, *e. g.*, *Coker* v. *Georgia*, 433 U. S. 584, 592 (1977) (plurality opinion).   As the Court has indicated, no one factor will be dispositive in a given case.   See *Hutto* v. *Davis*, 454 U. S. 370, 373–374, n. 2 (1982) *(per curiam)*; *Rummel* v. *Estelle*, 445 U. S., at 275–276.   The inherent nature of our federal system and the need for individualized sentencing decisions result in a wide range of constitutional sentences.   Thus no single criterion can identify when a sentence is so grossly disproportionate that it violates the Eighth Amendment.   See Jeffries & Stephan, Defenses, Presumptions, and Burden of Proof in the Criminal Law, 88 Yale L. J. 1325, 1376–1377 (1979).   But a combination of objective factors can make such analysis possible.

tions. In *Enmund* the Court conducted an extensive review of capital punishment statutes and determined that "only about a third of American jurisdictions would ever permit a defendant [such as Enmund] to be sentenced to die." 458 U. S., at 792. Even in those jurisdictions, however, the death penalty was almost never imposed under similar circumstances. *Id.*, at 794–796. The Court's review of foreign law also supported its conclusion. *Id.*, at 796–797, n. 22. The analysis in *Coker* was essentially the same. 433 U. S., at 593–597. And in *Weems* the Court relied on the fact that, under federal law, a similar crime was punishable by only two years' imprisonment and a fine. 217 U. S., at 380. Cf. *Trop* v. *Dulles*, 356 U. S. 86, 102–103 (1958) (plurality opinion).

In sum, a court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.

## B

Application of these factors assumes that courts are competent to judge the gravity of an offense, at least on a relative scale. In a broad sense this assumption is justified, and courts traditionally have made these judgments—just as legislatures must make them in the first instance. Comparisons can be made in light of the harm caused or threatened to the victim or society, and the culpability of the offender. Thus in *Enmund* the Court determined that the petitioner's conduct was not as serious as his accomplices' conduct. Indeed, there are widely shared views as to the relative seriousness of crimes. See Rossi, Waite, Bose, & Berk, The Seriousness of Crimes: Normative Structure and Individual Differences, 39 Am. Sociological Rev. 224, 237 (1974) (hereafter Rossi et al.). For example, as the criminal laws make clear, nonviolent crimes are less serious than crimes marked by violence

or the threat of violence. Cf. Tr. of Oral Arg. 16 (the State recognizes that the criminal law is more protective of people than property).

There are other accepted principles that courts may apply in measuring the harm caused or threatened to the victim or society. The absolute magnitude of the crime may be relevant. Stealing a million dollars is viewed as more serious than stealing a hundred dollars—a point recognized in statutes distinguishing petty theft from grand theft. See, e. g., S. D. Codified Laws § 22–30A–17 (Supp. 1982). Few would dispute that a lesser included offense should not be punished more severely than the greater offense. Thus a court is justified in viewing assault with intent to murder as more serious than simple assault. See Roberts v. Collins, 544 F. 2d 168, 169–170 (CA4 1976) (per curiam), cert. denied, 430 U. S. 973 (1977). Cf. Dembowski v. State, 251 Ind. 250, 252, 240 N. E. 2d 815, 817 (1968) (armed robbery more serious than robbery); Cannon v. Gladden, 203 Ore. 629, 632, 281 P. 2d 233, 235 (1955) (rape more serious than assault with intent to commit rape). It also is generally recognized that attempts are less serious than completed crimes. See, e. g., S. D. Codified Laws § 22–4–1 (1979); 4 Blackstone *15. Similarly, an accessory after the fact should not be subject to a higher penalty than the principal. See, e. g., 18 U. S. C. § 3.

Turning to the culpability of the offender, there are again clear distinctions that courts may recognize and apply. In Enmund the Court looked at the petitioner's lack of intent to kill in determining that he was less culpable than his accomplices. 458 U. S., at 798. Most would agree that negligent conduct is less serious than intentional conduct. South Dakota, for example, ranks criminal acts in ascending order of seriousness as follows: negligent acts, reckless acts, knowing acts, intentional acts, and malicious acts. S. D. Codified Laws § 22–1–2(1)(f) (Supp. 1982). A court, of course, is entitled to look at a defendant's motive in committing a crime. Thus a murder may be viewed as more serious when commit-

ted pursuant to a contract. See, *e. g.*, Mass. Gen. Laws Ann., ch. 279, § 69(a)(5) (West Supp. 1982–1983); cf. 4 Blackstone *15; *In re Foss*, 10 Cal. 3d 910, 519 P. 2d 1073 (1974).

This list is by no means exhaustive. It simply illustrates that there are generally accepted criteria for comparing the severity of different crimes on a broad scale, despite the difficulties courts face in attempting to draw distinctions between similar crimes.

## C

Application of the factors that we identify also assumes that courts are able to compare different sentences. This assumption, too, is justified. The easiest comparison, of course, is between capital punishment and noncapital punishments, for the death penalty is different from other punishments in kind rather than degree.[18] For sentences of imprisonment, the problem is not so much one of ordering, but one of line-drawing. It is clear that a 25-year sentence generally is more severe than a 15-year sentence,[19] but in most cases it would be difficult to decide that the former violates the Eighth Amendment while the latter does not. Decisions of this kind, although troubling, are not unique to this area. The courts are constantly called upon to draw similar lines in a variety of contexts.

The Sixth Amendment offers two good examples. A State is constitutionally required to provide an accused with a speedy trial, *Klopfer* v. *North Carolina*, 386 U. S. 213 (1967), but the delay that is permissible must be determined on a case-by-case basis. "[A]ny inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case . . . ." *Barker* v. *Wingo*, 407 U. S. 514, 522 (1972) (unanimous opinion). In *Barker*, we identi-

---

[18] There is also a clear line between sentences of imprisonment and sentences involving no deprivation of liberty. See *Argersinger* v. *Hamlin*, 407 U. S. 25 (1972).

[19] The possibility of parole may complicate the comparison, depending upon the time and conditions of its availability.

fied some of the objective factors that courts should consider in determining whether a particular delay was excessive. *Id.*, at 530. None of these factors is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Id.*, at 533. Thus the type of inquiry that a court should conduct to determine if a given sentence is constitutionally disproportionate is similar to the type of inquiry required by the Speedy Trial Clause.

The right to a jury trial is another example. *Baldwin* v. *New York*, 399 U. S. 66 (1970), in particular, illustrates the line-drawing function of the judiciary, and offers guidance on the method by which some lines may be drawn. There the Court determined that a defendant has a right to a jury trial "where imprisonment for more than six months is authorized." *Id.*, at 69 (plurality opinion). In choosing the 6-month standard, the plurality relied almost exclusively on the fact that only New York City denied the right to a jury trial for an offense punishable by more than six months. As JUSTICE WHITE explained:

> "This near-uniform judgment of the Nation furnishes us with the only objective criterion by which a line could ever be drawn—on the basis of the possible penalty alone—between offenses that are and that are not regarded as 'serious' for purposes of trial by jury." *Id.*, at 72–73.

In short, *Baldwin* clearly demonstrates that a court properly may distinguish one sentence of imprisonment from another. It also supports our holding that courts properly may look to the practices in other jurisdictions in deciding where lines between sentences should be drawn.

### IV

It remains to apply the analytical framework established by our prior decisions to the case before us. We first con-

sider the relevant criteria, viewing Helm's sentence as life imprisonment without possibility of parole. We then consider the State's argument that the possibility of commutation is sufficient to save an otherwise unconstitutional sentence.

## A

Helm's crime was "one of the most passive felonies a person could commit." *State* v. *Helm*, 287 N. W. 2d, at 501 (Henderson, J., dissenting). It involved neither violence nor threat of violence to any person. The $100 face value of Helm's "no account" check was not trivial, but neither was it a large amount. One hundred dollars was less than half the amount South Dakota required for a felonious theft.[20] It is easy to see why such a crime is viewed by society as among the less serious offenses. See Rossi et al., at 229.

Helm, of course, was not charged simply with uttering a "no account" check, but also with being a habitual offender.[21] And a State is justified in punishing a recidivist more severely than it punishes a first offender. Helm's status, however, cannot be considered in the abstract. His prior offenses, although classified as felonies, were all relatively

---

[20] If Helm had been convicted simply of taking $100 from a cash register, S. D. Codified Laws § 22–30A–1 (1979), or defrauding someone of $100, § 22–30A–3, or obtaining $100 through extortion, § 22–30A–4(1), or blackmail, § 22–30A–4(3), or using a false credit card to obtain $100, § 22–30A–8.1, or embezzling $100, § 22–30A–10, he would not be in prison today. All of these offenses would have been petty theft, a misdemeanor. § 22–30A–17 (amended 1982). Similarly, if Helm had written a $100 check against insufficient funds, rather than a nonexistent account, he would have been guilty of a misdemeanor. §§ 22–41–1. Curiously, under South Dakota law there is no distinction between writing a "no account" check for a large sum and writing a "no account" check for a small sum. § 22–41–1.2.

[21] We must focus on the principal felony—the felony that triggers the life sentence—since Helm already has paid the penalty for each of his prior offenses. But we recognize, of course, that Helm's prior convictions are relevant to the sentencing decision.

minor.[22]   All were nonviolent and none was a crime against a person.   Indeed, there was no minimum amount in either the burglary or the false pretenses statutes, see nn. 1 and 2, *supra*, and the minimum amount covered by the grand larceny statute was fairly small, see n. 3, *supra*.[23]

Helm's present sentence is life imprisonment without possibility of parole.[24]   Barring executive clemency, see *infra*, at 300–303, Helm will spend the rest of his life in the state penitentiary.   This sentence is far more severe than the life sentence we considered in *Rummel* v. *Estelle*.   Rummel was likely to have been eligible for parole within 12 years of his initial confinement,[25] a fact on which the Court relied heavily.   See 445 U. S., at 280–281.   Helm's sentence is the most severe punishment that the State could have imposed on any criminal for any crime.   See n. 6, *supra*.   Only capital punishment, a penalty not authorized in South Dakota when Helm was sentenced, exceeds it.

---

[22] Helm, who was 36 years old when he was sentenced, is not a professional criminal.   The record indicates an addiction to alcohol, and a consequent difficulty in holding a job.   His record involves no instance of violence of any kind.   Incarcerating him for life without possibility of parole is unlikely to advance the goals of our criminal justice system in any substantial way.   Neither Helm nor the State will have an incentive to pursue clearly needed treatment for his alcohol problem, or any other program of rehabilitation.

[23] As suggested at oral argument, the third-degree burglary statute covered entering a building with the intent to steal a loaf of bread.   Tr. of Oral Arg. 14–16.   It appears that the grand larceny statute would have covered the theft of a chicken.

[24] Every life sentence in South Dakota is without possibility of parole.   See *supra*, at 282.   We raise no question as to the general validity of sentences without possibility of parole.   The only issue before us is whether, in the circumstances of this case and in light of the constitutional principle of proportionality, the sentence imposed on this respondent violates the Eighth Amendment.

[25] We note that Rummel was, in fact, released within eight months of the Court's decision in his case.   See Los Angeles Times, Nov. 16, 1980, p. 1, col. 3.

We next consider the sentences that could be imposed on other criminals in the same jurisdiction. When Helm was sentenced, a South Dakota court was required to impose a life sentence for murder, S. D. Codified Laws § 22–16–12 (1979) (amended 1980), and was authorized to impose a life sentence for treason, § 22–8–1, first-degree manslaughter, § 22–16–15, first-degree arson, § 22–33–1, and kidnaping, S. D. Comp. Laws Ann. § 22–19–1 (1967 ed., Supp. 1978) (amended 1979). No other crime was punishable so severely on the first offense. Attempted murder, S. D. Codified Laws § 22–4–1(5) (1979), placing an explosive device on an aircraft, § 22–14A–5, and first-degree rape, § 22–22–1 (amended 1980 and 1982), were only Class 2 felonies. Aggravated riot was only a Class 3 felony. § 22–10–5. Distribution of heroin, §§ 22–42–2 (amended 1982), 34–20B–13(7) (1977), and aggravated assault, § 22–18–1.1 (amended 1980 and 1981), were only Class 4 felonies.

Helm's habitual offender status complicates our analysis, but relevant comparisons are still possible. Under § 22–7–7, the penalty for a second or third felony is increased by one class. Thus a life sentence was mandatory when a second or third conviction was for treason, first-degree manslaughter, first-degree arson, or kidnaping, and a life sentence would have been authorized when a second or third conviction was for such crimes as attempted murder, placing an explosive device on an aircraft, or first-degree rape. Finally, § 22–7–8, under which Helm was sentenced, authorized life imprisonment after three prior convictions, regardless of the crimes.

In sum, there were a handful of crimes that were necessarily punished by life imprisonment: murder, and, on a second or third offense, treason, first-degree manslaughter, first-degree arson, and kidnaping. There was a larger group for which life imprisonment was authorized in the discretion of the sentencing judge, including: treason, first-degree manslaughter, first-degree arson, and kidnaping; attempted murder, placing an explosive device on an aircraft, and first-

degree rape on a second or third offense; and any felony after three prior offenses. Finally, there was a large group of very serious offenses for which life imprisonment was not authorized, including a third offense of heroin dealing or aggravated assault.

Criminals committing any of these offenses ordinarily would be thought more deserving of punishment than one uttering a "no account" check—even when the bad-check writer had already committed six minor felonies. Moreover, there is no indication in the record that any habitual offender other than Helm has ever been given the maximum sentence on the basis of comparable crimes. It is more likely that the possibility of life imprisonment under § 22–7–8 generally is reserved for criminals such as fourth-time heroin dealers, while habitual bad-check writers receive more lenient treatment.[26] In any event, Helm has been treated in the same manner as, or more severely than, criminals who have committed far more serious crimes.

Finally, we compare the sentences imposed for commission of the same crime in other jurisdictions. The Court of Appeals found that "Helm could have received a life sentence without parole for his offense in only one other state, Nevada," 684 F. 2d, at 586, and we have no reason to doubt this finding. See Tr. of Oral Arg. 21. At the very least, therefore, it is clear that Helm could not have received such a severe sentence in 48 of the 50 States. But even under Nevada law, a life sentence without possibility of parole is

---

[26] The State contends that § 22–7–8 is more lenient than the Texas habitual offender statute in *Rummel*, for life imprisonment under § 22–7–8 is discretionary rather than mandatory. Brief for Petitioner 22. Helm, however, has challenged only his own sentence. No one suggests that § 22–7–8 may not be applied constitutionally to fourth-time heroin dealers or other violent criminals. Thus we do not question the legislature's judgment. Unlike in *Rummel*, a lesser sentence here could have been entirely consistent with both the statute and the Eighth Amendment. See Note, Disproportionality in Sentences of Imprisonment, 79 Colum. L. Rev. 1119, 1160 (1979).

merely authorized in these circumstances. See Nev. Rev. Stat. § 207.010(2) (1981). We are not advised that any defendant such as Helm, whose prior offenses were so minor, actually has received the maximum penalty in Nevada.[27] It appears that Helm was treated more severely than he would have been in any other State.

## B

The State argues that the present case is essentially the same as *Rummel* v. *Estelle*, for the possibility of parole in that case is matched by the possibility of executive clemency here. The State reasons that the Governor could commute Helm's sentence to a term of years. We conclude, however, that the South Dakota commutation system is fundamentally different from the parole system that was before us in *Rummel*.

As a matter of law, parole and commutation are different concepts, despite some surface similarities. Parole is a regular part of the rehabilitative process. Assuming good behavior, it is the normal expectation in the vast majority of cases. The law generally specifies when a prisoner will be eligible to be considered for parole, and details the standards and procedures applicable at that time. See, *e. g.*, *Greenholtz* v. *Nebraska Penal Inmates*, 442, U. S. 1 (1979) (detailing Nebraska parole procedures); *Morrissey* v. *Brewer*, 408 U. S. 471, 477 (1972) ("the practice of releasing prisoners on parole

---

[27] Under § 207.010(2), a Nevada court is authorized to impose a sentence of "imprisonment in the state prison for life with or without possibility of parole. If the penalty fixed by the court is life imprisonment with the possibility of parole, eligibility for parole begins when a minimum of 10 years has been served." It appears that most sentences imposed under § 207.010(2) permit parole, even when the prior crimes are far more serious than Helm's. See, *e. g.*, *Rusling* v. *State*, 96 Nev. 778, 617 P. 2d 1302 (1980) (possession of a firearm by an ex-felon, two instances of driving an automobile without the owner's consent, four first-degree burglaries, two sales of marihuana, two sales of a restricted dangerous drug, one sale of heroin, one escape from state prison, and one second-degree burglary).

before the end of their sentences has become an integral part of the penological system"). Thus it is possible to predict, at least to some extent, when parole might be granted. Commutation, on the other hand, is an ad hoc exercise of executive clemency. A Governor may commute a sentence at any time for any reason without reference to any standards. See, *e. g.*, *Connecticut Board of Pardons* v. *Dumschat*, 452 U. S. 458 (1981).

We explicitly have recognized the distinction between parole and commutation in our prior cases.[28] Writing on behalf of the *Morrissey* Court, for example, CHIEF JUSTICE BURGER contrasted the two possibilities: "Rather than being an *ad hoc* exercise of clemency, parole is an established variation on imprisonment of convicted criminals." 408 U. S., at 477. In *Dumschat*, THE CHIEF JUSTICE similarly explained that "there is a vast difference between a denial of parole . . . and a state's refusal to commute a lawful sentence." 452 U. S., at 466.

The Texas and South Dakota systems in particular are very different. In *Rummel*, the Court did not rely simply on the existence of some system of parole. Rather it looked to the provisions of the system presented, including the fact that Texas had "a relatively liberal policy of granting 'good time' credits to its prisoners, a policy that historically has allowed a prisoner serving a life sentence to become eligible for parole in as little as 12 years." 445 U. S., at 280. A Texas prisoner became eligible for parole when his calendar time

---

[28] In *Rummel* itself the Court implicitly recognized that the possibility of commutation is not equivalent to the possibility of parole. The Court carefully "distinguish[ed] Rummel from a person sentenced under a recidivist statute like [Miss. Code Ann. § 99–19–83 (Supp. 1979)], which provides for a sentence of life without parole." 445 U. S., at 281. But the Mississippi Constitution empowers the Governor to grant pardons in "all criminal and penal cases, excepting those of treason and impeachment." Art. 5, § 124. The Mississippi Supreme Court has long recognized that the power to pardon includes the power to commute a convict's sentence. See *Whittington* v. *Stevens*, 221 Miss. 598, 603–604, 73 So. 2d 137, 139–140 (1954).

served plus "good conduct" time equaled one-third of the maximum sentence imposed or 20 years, whichever is less. Tex. Code Crim. Proc. Ann., Art. 42.12, § 15(b) (Vernon 1979). An entering prisoner earned 20 days good-time per 30 days served, Brief for Respondent in *Rummel*, O. T. 1979, No. 78–6386, p. 16, and this could be increased to 30 days good-time per 30 days served, see Tex. Rev. Civ. Stat. Ann., Art. 6181–1, §§ 2, 3 (Vernon Supp. 1982–1983). Thus Rummel could have been eligible for parole in as few as 10 years, and could have expected to become eligible, in the normal course of events, in only 12 years.

In South Dakota commutation is more difficult to obtain than parole. For example, the Board of Pardons and Paroles is authorized to make commutation recommendations to the Governor, see n. 7, *supra*, but § 24–13–4 provides that "no recommendation for the commutation of . . . a life sentence, or for a pardon . . . , shall be made by less than the unanimous vote of all members of the board." In fact, no life sentence has been commuted in over eight years,[29] App. 29, while parole—where authorized—has been granted regularly during that period, Tr. of Oral Arg. 8–9. Furthermore, even if Helm's sentence were commuted, he merely would be eligible to be considered for parole.[30] Not only is there no

---

[29] The most recent commutation of a life sentence in South Dakota occurred in 1975. App. 29. During the eight years since then, over 100 requests for commutation have been denied. See *id.*, at 22–26. Although 22 life sentences were commuted to terms of years between 1964 and 1975, see *id.*, at 29; but see n. 30, *infra*, we do not have complete figures on the number of requests that were denied during the same period. We are told only that at least 35 requests were denied. See App. 22–26. In any event, past practice in this respect—particularly the practice of a decade ago—is not a reliable indicator of future performance when the relevant decision is left to the unfettered discretion of each Governor. Indeed, the best indication we have of Helm's chance for commutation is the fact that his request already has been denied. *Id.*, at 26.

[30] The record indicates that the prisoner whose life sentence was commuted in 1975, see n. 29, *supra*, still has not been paroled. App. 29.

guarantee that he would be paroled, but the South Dakota parole system is far more stringent than the one before us in *Rummel.* Helm would have to serve three-fourths of his revised sentence before he would be eligible for parole, § 24–15–5, and the provision for good-time credits is less generous, § 24–5–1.[31]

The possibility of commutation is nothing more than a hope for "an *ad hoc* exercise of clemency." It is little different from the possibility of executive clemency that exists in every case in which a defendant challenges his sentence under the Eighth Amendment. Recognition of such a bare possibility would make judicial review under the Eighth Amendment meaningless.

## V

The Constitution requires us to examine Helm's sentence to determine if it is proportionate to his crime. Applying objective criteria, we find that Helm has received the penultimate sentence for relatively minor criminal conduct. He has been treated more harshly than other criminals in the State who have committed more serious crimes. He has been treated more harshly than he would have been in any other jurisdiction, with the possible exception of a single State. We conclude that his sentence is significantly disproportionate to his crime, and is therefore prohibited by the Eighth Amendment.[32] The judgment of the Court of Appeals is accordingly

*Affirmed.*

---

[31] Assume, for example, that in 1979 the Governor had commuted Helm's sentence to a term of 40 years (his approximate life expectancy). Even if Helm were a model prisoner, he would not have been eligible for parole until he had served over 21 years—more than twice the *Rummel* minimum. And this comparison is generous to South Dakota's position. If Rummel had been sentenced to 40 years rather than life, he could have been eligible for parole in less than 7 years.

[32] Contrary to the suggestion in the dissent, *post,* at 305–312, our conclusion today is not inconsistent with *Rummel* v. *Estelle.* The *Rummel* Court recognized—as does the dissent, see *post,* at 311, n. 3—that some sentences

CHIEF JUSTICE BURGER, with whom JUSTICE WHITE, JUSTICE REHNQUIST, and JUSTICE O'CONNOR join, dissenting.

The controlling law governing this case is crystal clear, but today the Court blithely discards any concept of *stare decisis*, trespasses gravely on the authority of the states, and distorts the concept of proportionality of punishment by tearing it from its moorings in capital cases.   Only three Terms ago, we held in *Rummel* v. *Estelle*, 445 U. S. 263 (1980), that a life sentence imposed after only a *third* nonviolent felony conviction did not constitute cruel and unusual punishment under the Eighth Amendment.   Today, the Court ignores its recent precedent and holds that a life sentence imposed after a *seventh* felony conviction constitutes cruel and unusual punishment under the Eighth Amendment.   Moreover, I reject the fiction that all Helm's crimes were innocuous or nonviolent.   Among his felonies were three burglaries and a third conviction for drunken driving.   By comparison Rummel was a relatively "model citizen."   Although today's holding cannot rationally be reconciled with *Rummel*, the Court does not purport to overrule *Rummel*.   I therefore dissent.

I

A

The Court's starting premise is that the Eighth Amendment's Cruel and Unusual Punishments Clause "prohibits not

---

of imprisonment are so disproportionate that they violate the Eighth Amendment.   445 U. S., at 274, n. 11.   Indeed, *Hutto* v. *Davis*, 454 U. S., at 374, and n. 3, makes clear that *Rummel* should not be read to foreclose proportionality review of sentences of imprisonment.   *Rummel* did reject a proportionality challenge to a particular sentence.   But since the *Rummel* Court—like the dissent today—offered no standards for determining when an Eighth Amendment violation has occurred, it is controlling only in a similar factual situation.   Here the facts are clearly distinguishable.   Whereas Rummel was eligible for a reasonably early parole, Helm, at age 36, was sentenced to life with no possibility of parole. See *supra*, at 297, and 300–303.

only barbaric punishments, but also sentences that are disproportionate to the crime committed." *Ante*, at 284. What the Court means is that a sentence is unconstitutional if it is more severe than five Justices think appropriate. In short, all sentences of imprisonment are subject to appellate scrutiny to ensure that they are "proportional" to the crime committed.

The Court then sets forth three assertedly "objective" factors to guide the determination of whether a given sentence of imprisonment is constitutionally excessive: (1) the "gravity of the offense and the harshness of the penalty," *ante*, at 290–291; (2) a comparison of the sentence imposed with "sentences imposed on other criminals in *the same* jurisdiction," *ante*, at 291 (emphasis added); (3) and a comparison of "the sentences imposed for commission of the same crime in *other* jurisdictions." *Ante*, at 291–292 (emphasis added). In applying this analysis, the Court determines that respondent

> "has received the penultimate sentence for *relatively minor* criminal conduct. He has been treated more harshly than other criminals in the State who have committed more serious crimes. He has been treated more harshly than he would have been in any other jurisdiction . . . ." *Ante*, at 303. (Emphasis added.)

Therefore, the Court concludes, respondent's sentence is "significantly disproportionate to his crime, and is . . . prohibited by the Eighth Amendment." This analysis is completely at odds with the reasoning of our recent holding in *Rummel*, in which, of course, JUSTICE POWELL dissented.

## B

The facts in *Rummel* bear repeating. Rummel was convicted in 1964 of fraudulent use of a credit card; in 1969, he was convicted of passing a forged check; finally, in 1973 Rummel was charged with obtaining money by false pretenses, which is also a felony under Texas law. These three offenses were indeed nonviolent. Under Texas' recidivist

statute, which provides for a mandatory life sentence upon conviction for a third felony, the trial judge imposed a life sentence as he was obliged to do after the jury returned a verdict of guilty of felony theft.

Rummel, in this Court, advanced precisely the same arguments that respondent advances here; we rejected those arguments notwithstanding that his case was stronger than respondent's. The test in *Rummel* which we rejected would have required us to determine on an abstract moral scale whether Rummel had received his "just deserts" for his crimes. We declined that invitation; today the Court accepts it. Will the Court now recall Rummel's case so five Justices will not be parties to "disproportionate" criminal justice?

It is true, as we acknowledged in *Rummel*, that the "Court has on occasion stated that the Eighth Amendment prohibits imposition of a sentence that is grossly disproportionate to the severity of the crime." 445 U. S., at 271. But even a cursory review of our cases shows that this type of proportionality review has been carried out only in a very limited category of cases, and never before in a case involving solely a sentence of imprisonment. In *Rummel*, we said that the proportionality concept of the capital punishment cases was inapposite because of the "unique nature of the death penalty . . . ." *Id.*, at 272. "Because a sentence of death differs in kind from any sentence of imprisonment, no matter how long, our decisions applying the prohibition of cruel and unusual punishments to capital cases are of limited assistance in deciding the constitutionality of the punishment meted out to Rummel." *Ibid.*

The *Rummel* Court also rejected the claim that *Weems* v. *United States*, 217 U. S. 349 (1910), required it to determine whether Rummel's punishment was "disproportionate" to his crime. In *Weems*, the Court had struck down as cruel and unusual punishment a sentence of *cadena temporal* imposed by a Philippine Court. This bizarre penalty, which was un-

known to Anglo-Saxon law, entailed a minumum of 12 years' imprisonment chained day and night at the wrists and ankles, hard and painful labor while so chained, and a number of "accessories" including lifetime civil disabilities. In *Rummel* the Court carefully noted that *"[Weems'] finding* of disproportionality cannot be wrenched from the facts of that case." 445 U. S., at 273.[1]

The lesson the *Rummel* Court drew from *Weems* and from the capital punishment cases was that the Eighth Amendment did not authorize courts to review sentences of *imprisonment* to determine whether they were "proportional" to the crime. In language quoted incompletely by the Court, *ante*, at 288–289, n. 14, the *Rummel* Court stated:

> "Given the *unique nature* of the punishments considered in *Weems* and in the death penalty cases, one could argue without fear of contradiction by any decision of this Court that for crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms of imprisonment in a state penitentiary, the *length of the sentence actually imposed is purely a matter of legislative prerogative.*" 445 U. S., at 274. (Emphasis added.)

Five Justices joined this clear and precise limiting language.

In context it is clear that the *Rummel* Court was not merely summarizing an argument, as the Court suggests, *ante*, at 288–289, n. 14, but was stating affirmatively the rule of law laid down. This passage from *Rummel* is followed by an explanation of why it is permissible for courts to review sentences of death or bizarre physically cruel punishments as in *Weems*, but not sentences of imprisonment. 445 U. S., at 274–275. The *Rummel* Court emphasized, as has every

---

[1] Other authorities have shared this interpretation of *Weems* v. *United States.* *E. g.*, Packer, Making the Punishment Fit the Crime, 77 Harv. L. Rev. 1071, 1075 (1964).

opinion in capital cases in the past decade, that it was possible to draw a "bright line" between "the punishment of death and the various other permutations and commutations of punishment short of that ultimate sanction"; similarly, a line could be drawn between the punishment in *Weems* and "more traditional forms of imprisonment imposed under the Anglo-Saxon system." 445 U. S., at 275. However, the *Rummel* Court emphasized that drawing lines between different sentences of imprisonment would thrust the Court inevitably "into the basic line-drawing process that is pre-eminently the province of the legislature" and produce judgments that were no more than the visceral reactions of individual Justices. *Ibid.*

The *Rummel* Court categorically rejected the very analysis adopted by the Court today. Rummel had argued that various objective criteria existed by which the Court could determine whether his life sentence was proportional to his crimes. In rejecting Rummel's contentions, the Court explained why each was insufficient to allow it to determine in an *objective* manner whether a given sentence of imprisonment is proportionate to the crime for which it is imposed.

First, it rejected the distinctions Rummel tried to draw between violent and nonviolent offenses, noting that "the absence of violence does not always affect the strength of society's interest in deterring a particular crime or in punishing a particular criminal." *Ibid.* Similarly, distinctions based on the amount of money stolen are purely "subjective" matters of line drawing. *Id.*, at 275–276.

Second, the Court squarely rejected Rummel's attempt to compare his sentence with the sentence he would have received in other States—an argument that the Court today accepts. The *Rummel* Court explained that such comparisons are flawed for several reasons. For one, the recidivist laws of the various states vary widely. "It is one thing for a court to compare those States that impose capital punishment for a

specific offense with those States that do not. It is quite another thing for a court to attempt to evaluate the position of any particular recidivist scheme within Rummel's complex matrix." *Id.*, at 280 (citation and footnote omitted). Another reason why comparison between the recidivist statutes of different states is inherently complex is that some states have comprehensive provisions for parole and others do not. *Id.*, at 280–281. Perhaps most important, such comparisons trample on fundamental concepts of federalism. Different states surely may view particular crimes as more or less severe than other states. Stealing a horse in Texas may have different consequences and warrant different punishment than stealing a horse in Rhode Island or Washington, D. C. Thus, even if the punishment accorded Rummel in Texas were to exceed that which he would have received in any other state,

> "that severity hardly would render Rummel's punishment 'grossly disproportionate' to his offenses or to the punishment he would have received in the other States. . . . *Absent a constitutionally imposed uniformity inimical to traditional notions of federalism, some State will always bear the distinction of treating particular offenders more severely than any other State.*" *Id.*, at 281–282. (Emphasis added.)

Finally, we flatly rejected Rummel's suggestion that we measure his sentence against the sentences imposed by Texas for other crimes:

> "Other crimes, of course, implicate other societal interests, making any such comparison inherently speculative. . . .
>
> ". . . Once the death penalty and other punishments different in kind from fine or imprisonment have been put to one side, there remains little in the way of objective standards for judging whether or not a life sentence imposed under a recidivist statute for several separate

felony convictions not involving 'violence' violates the cruel-and-unusual-punishment prohibition of the Eighth Amendment." *Id.*, at 282–283, n. 27.

Rather, we held that the severity of punishment to be accorded different crimes was peculiarly a matter of legislative policy. *Ibid.*

In short, *Rummel* held that the length of a sentence of imprisonment is a matter of legislative discretion; this is so particularly for recidivist statutes. I simply cannot understand how the Court can square *Rummel* with its holding that "a criminal sentence must be proportionate to the crime for which the defendant has been convicted." *Ante*, at 290.[2]

If there were any doubts as to the meaning of *Rummel*, they were laid to rest last Term in *Hutto* v. *Davis*, 454 U. S. 370 (1982) *(per curiam)*. There a United States District Court held that a 40-year sentence for the possession of nine ounces of marihuana violated the Eighth Amendment. The District Court applied almost exactly the same analysis adopted today by the Court. Specifically, the District Court stated:

> "After examining the nature of the offense, the legislative purpose behind the punishment, the punishment in . . . Virginia [the sentencing jurisdiction] for other offenses, and the punishment actually imposed for the same or similar offenses in Virginia, this court must necessarily conclude that a sentence of forty years and twenty thousand dollars in fines is so grossly out of proportion to the severity of the crimes as to constitute cruel and unusual punishment in violation of the Eighth Amendment of the

---

[2] Although *Rummel* v. *Estelle*, 445 U. S., at 274, n. 11, conceded that "a proportionality principle [might] come into play . . . if a legislature made overtime parking a felony punishable by life imprisonment," the majority has not suggested that respondent's crimes are comparable to overtime parking. Respondent's seven felonies are far more severe than Rummel's three.

United States Constitution." *Davis* v. *Zahradnick*, 432 F. Supp. 444, 453 (WD Va. 1977).

The Court of Appeals sitting en banc affirmed. *Davis* v. *Davis*, 646 F. 2d 123 (CA4 1981) *(per curiam)*. We reversed in a brief *per curiam* opinion, holding that *Rummel* had disapproved each of the "objective" factors on which the District Court and en banc Court of Appeals purported to rely. 454 U. S., at 373. It was therefore clear error for the District Court to have been guided by these factors, which, paradoxically, the Court adopts today.

Contrary to the Court's interpretation of *Hutto*, see *ante*, at 289–290, and n. 17, and 303–304, n. 32, the *Hutto* Court did *not* hold that the District Court miscalculated in finding Davis' sentence disproportionate to his crime. It did *not* hold that the District Court improperly weighed the relevant factors. Rather, it held that the District Court clearly erred in even embarking on a determination whether the sentence was "disproportionate" to the crime. *Hutto* makes crystal clear that under *Rummel* it is error for appellate courts to second-guess legislatures as to whether a given sentence of imprisonment is excessive in relation to the crime,[3] as the Court does today, *ante*, at 295–303.

I agree with what the Court stated only days ago, that "the doctrine of *stare decisis*, while perhaps never entirely persuasive on a constitutional question, is a doctrine that demands respect in a society governed by the rule of law." *City of Akron* v. *Akron Center for Reproductive Health*,

---

[3] Both *Rummel* and *Hutto* v. *Davis*, leave open the possibility that in extraordinary cases—such as a life sentence for overtime parking—it might be permissible for a court to decide whether the sentence is grossly disproportionate to the crime. I agree that the Cruel and Unusual Punishments Clause might apply to those rare cases where reasonable men cannot differ as to the inappropriateness of a punishment. In all other cases, we should defer to the legislature's line-drawing. However, the Court does not contend that this is such an extraordinary case that reasonable men could not differ about the appropriateness of this punishment.

*Inc.*, 462 U. S. 416, 419–420 (1983). While the doctrine of *stare decisis* does not absolutely bind the Court to its prior opinions, a decent regard for the orderly development of the law and the administration of justice requires that directly controlling cases be either followed or candidly overruled.[4] Especially is this so with respect to two key holdings, neither more than three years old.

## II

Although historians and scholars have disagreed about the Framers' original intentions, the more common view seems to be that the Framers viewed the Cruel and Unusual Punishments Clause as prohibiting the kind of torture meted out during the reign of the Stuarts.[5] Moreover, it is clear that

---

[4] I do not read the Court's opinion as arguing that respondent's sentence of life imprisonment without possibility of parole is so different from Rummel's sentence of life imprisonment with the possibility of parole as to permit it to apply the proportionality review used in the death penalty cases, *e. g.*, *Coker* v. *Georgia*, 433 U. S. 584 (1977), to the former although not the latter. Nor would such an argument be tenable. As was noted in *Woodson* v. *North Carolina*, 428 U. S. 280, 305 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.):

"[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."

The greater need for reliability in death penalty cases cannot support a distinction between a sentence of life imprisonment with possibility of parole and a sentence of life imprisonment without possibility of parole, especially when an executive commutation is permitted as in South Dakota.

[5] Compare, *e. g.*, Granucci, "Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning, 57 Calif. L. Rev. 839 (1969); Schwartz, Eighth Amendment Proportionality Analysis and the Compelling Case of William Rummel, 71 J. Crim. L. & Criminology 378, 379–382 (1980); Katkin, Habitual Offender Laws: A Reconsideration, 21 Buffalo L. Rev. 99, 115 (1971), with, *e. g.*, Wheeler, Toward a Theory of Limited Punishment: An Examination of the Eighth Amendment, 24 Stan. L. Rev. 838,

until 1892, over 100 years after the ratification of the Bill of Rights, not a single Justice of this Court even asserted the doctrine adopted for the first time by the Court today. The prevailing view up to now has been that the Eighth Amendment reaches only the *mode* of punishment and not the length of a sentence of imprisonment.[6] In light of this history, it is disingenuous for the Court blandly to assert that "[t]he constitutional principle of proportionality has been recognized explicitly in this Court for almost a century." *Ante*, at 286. That statement seriously distorts history and our cases.

This Court has applied a proportionality test only in extraordinary cases, *Weems* being one example and the line of capital cases another. See, *e. g., Coker* v. *Georgia*, 433 U. S. 584 (1977); *Enmund* v. *Florida*, 458 U. S. 782 (1982). The Court's reading of the Eighth Amendment as restricting legislatures' authority to choose which crimes to punish by death rests on the finality of the death sentence. Such scrutiny is not required where a sentence of imprisonment is imposed after the State has identified a criminal offender whose record shows he will not conform to societal standards.

---

853–855 (1972); Comment, The Eighth Amendment, Beccaria, and the Enlightenment: An Historical Justification for the Weems v. United States Excessive Punishment Doctrine, 24 Buffalo L. Rev. 783 (1975).

[6] In 1892, the dissent in *O'Neil* v. *Vermont*, 144 U. S. 323, 339–340 (1892) (Field, J., dissenting), argued that the Eighth Amendment "is directed . . . against all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged." Before and after *O'Neil*, most authorities thought that the Eighth Amendment reached only the mode of punishment and not the length of sentences. See, *e. g.*, Note, 24 Harv. L. Rev. 54, 55 (1910). Even after *Weems* v. *United States*, 217 U. S. 349, was decided in 1910, it was thought unlikely that the Court would extend proportionality analysis to cases involving solely sentences of imprisonment. See Packer, *supra* n. 1, at 1075. Until today, not a single case of this Court applied the "excessive punishment" doctrine of *Weems* to a punishment consisting solely of a sentence of imprisonment, despite numerous opportunities to do so. *E. g., Hutto* v. *Davis*, 454 U. S. 370 (1982); *Rummel* v. *Estelle*, 445 U. S. 263 (1980); *Badders* v. *United States*, 240 U. S. 391 (1916); *Graham* v. *West Virginia*, 224 U. S. 616 (1912).

314

The Court's traditional abstention from reviewing sentences of imprisonment to ensure that punishment is "proportionate" to the crime is well founded in history, in prudential considerations, and in traditions of comity. Today's conclusion by five Justices that they are able to say that one offense has less "gravity" than another is nothing other than a bald substitution of individual subjective moral values for those of the legislature. Nor, as this case well illustrates, are we endowed with Solomonic wisdom that permits us to draw principled distinctions between sentences of different length for a chronic "repeater" who has demonstrated that he will not abide by the law.

The simple truth is that "[n]o neutral principle of adjudication permits a federal court to hold that in a given situation individual crimes are too trivial in relation to the punishment imposed." *Rummel* v. *Estelle*, 568 F. 2d 1193, 1201–1202 (CA5) (Thornberry, J., dissenting), vacated, 587 F. 2d 651 (1978) (en banc), aff'd, 445 U. S. 263 (1980). The apportionment of punishment entails, in Justice Frankfurter's words, "peculiarly questions of legislative policy." *Gore* v. *United States*, 357 U. S. 386, 393 (1958). Legislatures are far better equipped than we are to balance the competing penal and public interests and to draw the essentially arbitrary lines between appropriate sentences for different crimes.

By asserting the power to review sentences of imprisonment for excessiveness the Court launches into uncharted and unchartable waters. Today it holds that a sentence of life imprisonment, without the possibility of parole, is excessive punishment for a seventh allegedly "nonviolent" felony. How about the eighth "nonviolent" felony? The ninth? The twelfth? Suppose one offense was a simple assault? Or selling liquor to a minor? Or statutory rape? Or price fixing? The permutations are endless and the Court's opinion is bankrupt of realistic guiding principles. Instead, it casually lists several allegedly "objective" factors and arbitrarily asserts that they show respondent's sentence to be "signifi-

cantly disproportionate" to his crimes. *Ante*, at 303. Must all these factors be present in order to hold a sentence excessive under the Eighth Amendment? How are they to be weighed against each other? Suppose several states punish severely a crime that the Court views as trivial or petty? I can see no limiting principle in the Court's holding.

There is a real risk that this holding will flood the appellate courts with cases in which equally arbitrary lines must be drawn. It is no answer to say that appellate courts must review criminal convictions in any event; up to now, that review has been on the validity of the judgment, not the sentence. The vast majority of criminal cases are disposed of by pleas of guilty,[7] and ordinarily there is no appellate review in such cases. To require appellate review of all sentences of imprisonment—as the Court's opinion necessarily does—will "administer the *coup de grace* to the courts of appeals as we know them." H. Friendly, Federal Jurisdiction: A General View 36 (1973). This is judicial usurpation with a vengeance; Congress has pondered for decades the concept of appellate review of sentences and has hesitated to act.

### III

Even if I agreed that the Eighth Amendment prohibits imprisonment "disproportionate to the crime committed," *ante*, at 284, I reject the notion that respondent's sentence is disproportionate to his crimes for, if we are to have a system of laws, not men, *Rummel* is controlling.

The differences between this case and *Rummel* are insubstantial. First, Rummel committed three truly nonviolent felonies, while respondent, as noted at the outset, committed seven felonies, four of which cannot fairly be characterized as "nonviolent." At the very least, respondent's burglaries and his third-offense drunken driving posed real risk of serious

---

[7] In 1972, nearly 90% of the convictions in federal courts followed pleas of guilty or *nolo contedere*. H. Friendly, Federal Jurisdiction: A General View 36 (1973).

harm to others. It is sheer fortuity that the places respondent burglarized were unoccupied and that he killed no pedestrians while behind the wheel. What would have happened if a guard had been on duty during the burglaries is a matter of speculation, but the possibilities shatter the notion that respondent's crimes were innocuous, inconsequential, minor, or "nonviolent." Four of respondent's crimes, I repeat, had harsh potentialities for violence. Respondent, far more than Rummel, has demonstrated his inability to bring his conduct into conformity with the minimum standards of civilized society. Clearly, this difference demolishes any semblance of logic in the Court's conclusion that respondent's sentence constitutes cruel and unusual punishment although Rummel's did not.

The Court's opinion necessarily reduces to the proposition that a sentence of life imprisonment with the possibility of commutation, but without possibility of parole, is so much more severe than a life sentence with the possibility of parole that one is excessive while the other is not. This distinction does not withstand scrutiny; a well-behaved "lifer" in respondent's position is most unlikely to serve for life.

It is inaccurate to say, as the Court does, *ante*, at 301–302, that the *Rummel* holding relied on the fact that Texas had a relatively liberal parole policy. In context, it is clear that the *Rummel* Court's discussion of parole merely illustrated the difficulty of comparing sentences between different jurisdictions. 445 U. S., at 280–281. However, accepting the Court's characterization of *Rummel* as accurate, the Court today misses the point. Parole was relevant to an evaluation of Rummel's life sentence because in the "real world," he was unlikely to spend his entire life behind bars. Only a fraction of "lifers" are not released within a relatively few years. In Texas, the historical evidence showed that a prisoner serving a life sentence could become eligible for parole in as little as 12 years. In South Dakota, the historical evidence shows that since 1964, 22 life sentences have been commuted to

terms of years, while requests for commutation of 25 life sentences were denied. And, of course, those requests for commutation may be renewed.

In short, there is a significant probability that respondent will experience what so many "lifers" experience. Even assuming that at the time of sentencing respondent was likely to spend more time in prison than Rummel,[8] that marginal difference is surely supported by respondent's greater demonstrated propensity for crime—and for more serious crime at that.

## IV

It is indeed a curious business for this Court to so far intrude into the administration of criminal justice to say that a state legislature is barred by the Constitution from identifying its habitual criminals and removing them from the streets. Surely seven felony convictions warrant the conclusion that respondent is incorrigible. It is even more curious that the Court should brush aside controlling precedents that are barely in the bound volumes of the United States Reports. The Court would do well to heed Justice Black's comments about judges overruling the considered actions of legislatures under the guise of constitutional interpretation:

> "Such unbounded authority in any group of politically appointed or elected judges would unquestionably be sufficient to classify our Nation as a government of men, not the government of laws of which we boast. With a 'shock the conscience' test of constitutionality, citizens

---

[8] No one will ever know if or when Rummel would have been released on parole since he was released in connection with a separate federal habeas corpus proceeding in 1980. On October 3, 1980, a Federal District Court granted Rummel's petition for a writ of habeas corpus on the grounds of ineffective assistance of counsel. *Rummel* v. *Estelle*, 498 F. Supp. 793 (WD Tex. 1980). Rummel then pleaded guilty to theft by false pretenses and was sentenced to time served under the terms of a plea-bargaining agreement. Two-Bit Lifer Finally Freed—After Pleading Guilty, Chicago Tribune, Nov. 15, 1980, p. 2, col. 3.

318

must guess what is the law, guess what a majority of nine judges will believe fair and reasonable. Such a test wilfully throws away the certainty and security that lies in a written constitution, one that does not alter with a judge's health, belief, or his politics." *Boddie* v. *Connecticut*, 401 U. S. 371, 393 (1971) (dissenting).