Hampton v. State

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NOS.  2-04-290-CR

        2-04-291-CR

JOSEPH MAURICE HAMPTON APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I.  Introduction

In a single point, Joseph Maurice Hampton alleges error on the part of the trial court in sentencing him to forty years’ incarceration because he asserts the sentence is grossly disproportionate to the severity of the criminal act of which he was convicted, burglary of a habitation with intent to commit aggravated assault with a deadly weapon.

II.  Background

The incident which lead to Hampton’s arrest began at approximately 2:25 p.m. on March 21, 2002 when he arrived at the residence of his wife, Kim Hampton, who was living in the home of her parents with her children M.J.H., age 14, E.H., age 12, and Skylar D’Ottavio, her 20-year-old son by a different father.  Kim heard Hampton’s 1966 Ford Mustang pull into the driveway and believed that he was there to harm her because of numerous threatening phone calls that she had previously received from Hampton.  When Hampton knocked on the front door, Skylar, the only one of Kim’s children who was at home, told him to leave.  Hampton’s response was to shatter a front bedroom window with a sledgehammer, but as he attempted to climb through the broken window he was confronted by Skylar with a handgun, and warned to leave.  Momentarily withdrawing, Hampton’s next response was to reenter the window through the broken glass and tell Kim and Skylar that “someone is going to die” and that “no one is going to make it out of here alive.”  Kim had called 911 when this incident began and these comments were overheard by the 911 operator.  The verbal and physical threats did not end there.  Hampton took a large kitchen knife from behind his back and backed Kim and Skylar down a hallway toward a bedroom, stating that “you better shoot me because I am going to kill your ass, Skylar.”  Slashing motions made by Hampton’s knife caused a cut to Skylar’s throat.  Forcing them into the bedroom and locking the door, Hampton forced Kim on the bed and repeatedly attempted to stab her, resulting in severe cuts to Kim’s hand when she grabbed the blade of the knife to avoid being stabbed.  Skylar fired three shots into the floor which had no effect on Hampton, so Skylar struck Hampton in the head with the gun.  Skylar was able to wrestle the knife away from Hampton and unlock the bedroom door, which was followed by the timely entry of police officers responding to the 911 call.  After a considerable struggle with police, including being sprayed with O.C. spray and being hit on top of his head with a gun, Hampton was finally subdued.  Kim was transported to Harris Hospital and treated while paramedics treated Skylar’s injuries at the scene.

The foregoing, however, was but the culmination of a series of incidents perpetrated by Hampton.  Kim had decided to divorce Hampton prior to the sledgehammer incident because he had again started using drugs and refused to move out of their home.  During the week prior to the break in, Kim had received numerous threatening phone calls from Hampton.  There had also been an incident with an automobile where Hampton used his car to chase Kim and her two younger children in her car.  Hampton rammed Kim’s car several times and started to exit his vehicle with a baseball bat and Kim escaped by stopping a fire truck and asking firefighters to help her.  During this chase, M.J.H. was screaming “don’t let him get us” and was balled up on the floor of the vehicle.  Kim likewise described the whole incident as “really scary.” 

The threatening phone calls made prior to the sledgehammer incident were numerous and repetitive, coming “every couple of minutes, every minute for hours and hours.  All night long, all night long.”  As a result, Kim was unable to go to work.  In another incident, when she returned to her former residence, Hampton had cut up all of her clothing. 

As a result of all of the forgoing, Kim testified that she was “emotionally . . . shot” by Hampton’s conduct and that she no longer felt safe.  Skylar also testified that he was concerned for Kim’s safety if Hampton was ever released from custody. 

Hampton contended that at the time of the sledgehammer incident, he had been on a continual binge, having consumed three “fifths” of wine and smoked a hundred dollars of crack daily for a week prior to the incident and had been awake for three or four days with very little sleep.  On the day of the sledgehammer incident, he estimated that he had consumed a couple of fifths of Mad Dog 20/20 and smoked a half a gram of crack, felt suicidal, was depressed that his family was gone and wanted to talk to Kim about returning to their home.  He also claimed that he did not know what he said during the purported threatening phone calls because he was “so far out of it” and during the sledgehammer incident didn’t remember anything after he poked Skylar in the neck with the knife and until he was handcuffed on the floor.

Hampton’s “excuse” for his behavior was that he has a bipolar disorder and had not taken his medication.  Instead, cocaine, hydrocodone pills, and alcohol became Hampton’s medication of choice in lieu of his prescription.  He acknowledged that he knew if he didn’t take his prescription medication that he would engage in “crazy behavior” and claimed that at times he became dillusional. 

III.  Procedural Background

The grand jury indicted Hampton for two separate incidents of burglary of a habitation with intent to commit aggravated assault with a deadly weapon, with repeat felony offender allegations.  He plead guilty to both indictments and true to both repeat offender allegations.  After having considered the evidence, and arguments from Hampton’s counsel and counsel for the State, wherein Hampton requested the minimum incarceration of fifteen years and the State requested not less than sixty years, based on a possible punishment range of not less than fifteen years nor more than ninety-nine years/life and a fine not to exceed $10,000, the trial court judge found Hampton guilty of both cases, found the repeat felony offender allegation in both cases true and sentenced Hampton to incarceration for forty years on each case to be served concurrently. 

IV.  Cruel and Unusual Punishment?

While acknowledging that he was sentenced within the permitted punishment range, Hampton asserts that a sentence may still run afoul of the Eighth Amendment prohibition against cruel and unusual punishment.  
See Solem v. Helm
, 463 U.S. 277, 290, 103 S. Ct. 3001, 3009 (1983).  He asserts that the proper analysis is to first determine if the sentence is grossly disproportionate to the offense and then, if found to be grossly disproportionate, to compare the sentence received to (1) sentences for similar crimes in the same jurisdiction, and (2) sentences for the same crime in other jurisdictions. 
 See
 
McGruder v. Puckett
, 954 F.2d 313, 316 (5th
 Cir. 1992), 
cert. denied
, 506 U.S. 849 (1992); 
Jackson v. State
, 989 S.W.2d 842, 845-46 (Tex. App.—Texarkana 1999, no pet). 
Hampton also cites three Texas cases wherein he asserts similar conduct was punished with significantly shorter sentences.  
See Tatum v. State
, 649 S.W.2d 139, 140 (Tex. App.—Fort Worth 1983, no pet.) (ten years for burglary of a habitation); 
Barrerra v. State
, No. 14-02-041-CR, 2002 WL 31835063, *1 (Tex. App.—Houston [14th Dist.] Dec. 19, 2002, no pet.) (not designated for publication) (eight years); 
Sullivan v. State
, 975 S.W.2d 755, 756 (Tex. App.—Corpus Christi 1998, no pet.) (five years).  The State responds by distinguishing the cases cited by Hampton regarding shorter sentences for similar conduct, pointing out that in none of the cases cited is there evidence that the defendant had a prior felony conviction, that Hampton was charged with having committed
 two
 burglaries of a habitation with intent to commit aggravated assault with a deadly weapon, and that Hampton had engaged in a cocaine/hydrocodone/alcohol crazed course of terrorism against his wife and biological children including ramming his wife’s car with his own car and attempting to chase her with a baseball bat.  Having considered the foregoing, we cannot say that in any form or fashion that Hampton’s sentences of forty years are disproportionate to the conduct proven in this case, and hence cruel and unusual.  

The State also contends that Hampton failed to preserve error by not raising his disportionate sentencing argument to the trial court.  This court has been down this road before and held that this type of claim must be preserved by objecting at the trial court level.  
Acosta v. State
, No. 2-03-258-CR, 2005 WL 503199, at *6 (Tex. App.—Fort Worth Mar. 3, 2005, no pet. h.); 
Sims v. State
, Nos. 2-04-053 & 054-CR, 2004 WL 2792819, at *1 (Tex. App.—Fort Worth Dec. 2, 2004, pet. filed ) (mem. op.) (not designated for publication);
 Bloch v. State
, No. 2-03-363-CR, 2004 WL 2712149, at *3 (Tex. App.—Fort Worth Nov. 24, 2004, no pet.) (mem. op.) (not designated for publication); 
Puckett v. State
, Nos. 2-03-322 & 323-CR, 2004 WL 915015, at *2 (Tex. App.—Fort Worth Apr. 29, 2004, no pet.) (mem. op.) (not designated for publication); 
Finney v. State
, No. 2-02-034-CR, 2003 WL 151972, at * 1 (Tex. App.—Fort Worth Jan. 23, 2003, pet. ref’d) (mem. op.) (not designated for publication).
(footnote: 2)  We further hold that Hampton waived this point and it is therefor overruled.

V.  Conclusion

After having overruled Hampton’s sole point, we affirm the judgments of the trial court.

BOB MCCOY

JUSTICE

PANEL A: CAYCE, C.J.; DAUPHINOT and MCCOY, JJ.

CAYCE, C.J. concurs without opinion.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED:  June 9, 2005

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
But 
see Ray v. State
, 119 S.W.3d 454 (Tex. App.—Fort Worth 2003, pet. ref’d).  A plurality of this court held that “[I]t is not clear to us whether this complaint of constitutional error [cruel and unusual punishment] may be raised for the first time on direct appeal.  We, therefore, shall address Appellant’s point in the interest of justice and, because the same complaint may be raised in a subsequent writ, at least in the guise of ineffective assistance of counsel, in the interest of judicial economy.”  
Id.
 at 459.  This main opinion was joined with two concurrences, one of which was with an opinion which would have held that the appellant in that case “waived his complaint of constitutional error based upon cruel and unusual punishment.”  
Id
.