COURT OF 
APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NOS. 2-04-290-CR
     
                                                 2-04-291-CR
  
 
JOSEPH 
MAURICE HAMPTON                                                 APPELLANT
  
V.
  
THE 
STATE OF TEXAS                                                                  STATE
 
  
------------
 
FROM 
CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY
 
------------
 
MEMORANDUM OPINION[1]
 
------------
I. Introduction
        In 
a single point, Joseph Maurice Hampton alleges error on the part of the trial 
court in sentencing him to forty years’ incarceration because he asserts the 
sentence is grossly disproportionate to the severity of the criminal act of 
which he was convicted, burglary of a habitation with intent to commit 
aggravated assault with a deadly weapon.
II. Background
        The 
incident which lead to Hampton’s arrest began at approximately 2:25 p.m. on 
March 21, 2002 when he arrived at the residence of his wife, Kim Hampton, who 
was living in the home of her parents with her children M.J.H., age 14, E.H., 
age 12, and Skylar D’Ottavio, her 20-year-old son by a different father.  
Kim heard Hampton’s 1966 Ford Mustang pull into the driveway and believed that 
he was there to harm her because of numerous threatening phone calls that she 
had previously received from Hampton.  When Hampton knocked on the front 
door, Skylar, the only one of Kim’s children who was at home, told him to 
leave.  Hampton’s response was to shatter a front bedroom window with a 
sledgehammer, but as he attempted to climb through the broken window he was 
confronted by Skylar with a handgun, and warned to leave.  Momentarily 
withdrawing, Hampton’s next response was to reenter the window through the 
broken glass and tell Kim and Skylar that “someone is going to die” and that 
“no one is going to make it out of here alive.”  Kim had called 911 
when this incident began and these comments were overheard by the 911 
operator.  The verbal and physical threats did not end there.  Hampton 
took a large kitchen knife from behind his back and backed Kim and Skylar down a 
hallway toward a bedroom, stating that “you better shoot me because I am going 
to kill your ass, Skylar.”  Slashing motions made by Hampton’s knife 
caused a cut to Skylar’s throat.  Forcing them into the bedroom and 
locking the door, Hampton forced Kim on the bed and repeatedly attempted to stab 
her, resulting in severe cuts to Kim’s hand when she grabbed the blade of the 
knife to avoid being stabbed.  Skylar fired three shots into the floor 
which had no effect on Hampton, so Skylar struck Hampton in the head with the 
gun.  Skylar was able to wrestle the knife away from Hampton and unlock the 
bedroom door, which was followed by the timely entry of police officers 
responding to the 911 call.  After a considerable struggle with police, 
including being sprayed with O.C. spray and being hit on top of his head with a 
gun, Hampton was finally subdued.  Kim was transported to Harris Hospital 
and treated while paramedics treated Skylar’s injuries at the scene.
        The 
foregoing, however, was but the culmination of a series of incidents perpetrated 
by Hampton. Kim had decided to divorce Hampton prior to the sledgehammer 
incident because he had again started using drugs and refused to move out of 
their home.  During the week prior to the break in, Kim had received 
numerous threatening phone calls from Hampton.  There had also been an 
incident with an automobile where Hampton used his car to chase Kim and her two 
younger children in her car. Hampton rammed Kim’s car several times and 
started to exit his vehicle with a baseball bat and Kim escaped by stopping a 
fire truck and asking firefighters to help her.  During this chase, M.J.H. 
was screaming “don’t let him get us” and was balled up on the floor of the 
vehicle.  Kim likewise described the whole incident as “really scary.”
        The 
threatening phone calls made prior to the sledgehammer incident were numerous 
and repetitive, coming “every couple of minutes, every minute for hours and 
hours.  All night long, all night long.”  As a result, Kim was 
unable to go to work.  In another incident, when she returned to her former 
residence, Hampton had cut up all of her clothing.
        As 
a result of all of the forgoing, Kim testified that she was “emotionally . . . 
shot” by Hampton’s conduct and that she no longer felt safe.  Skylar 
also testified that he was concerned for Kim’s safety if Hampton was ever 
released from custody.
        Hampton 
contended that at the time of the sledgehammer incident, he had been on a 
continual binge, having consumed three “fifths” of wine and smoked a hundred 
dollars of crack daily for a week prior to the incident and had been awake for 
three or four days with very little sleep.  On the day of the sledgehammer 
incident, he estimated that he had consumed a couple of fifths of Mad Dog 20/20 
and smoked a half a gram of crack, felt suicidal, was depressed that his family 
was gone and wanted to talk to Kim about returning to their home.  He also 
claimed that he did not know what he said during the purported threatening phone 
calls because he was “so far out of it” and during the sledgehammer incident 
didn’t remember anything after he poked Skylar in the neck with the knife and 
until he was handcuffed on the floor.
        Hampton’s 
“excuse” for his behavior was that he has a bipolar disorder and had not 
taken his medication.  Instead, cocaine, hydrocodone pills, and alcohol 
became Hampton’s medication of choice in lieu of his prescription.  He 
acknowledged that he knew if he didn’t take his prescription medication that 
he would engage in “crazy behavior” and claimed that at times he became 
dillusional.
III. Procedural Background
        The 
grand jury indicted Hampton for two separate incidents of burglary of a 
habitation with intent to commit aggravated assault with a deadly weapon, with 
repeat felony offender allegations. He plead guilty to both indictments and true 
to both repeat offender allegations.  After having considered the evidence, 
and arguments from Hampton’s counsel and counsel for the State, wherein 
Hampton requested the minimum incarceration of fifteen years and the State 
requested not less than sixty years, based on a possible punishment range of not 
less than fifteen years nor more than ninety-nine years/life and a fine not to 
exceed $10,000, the trial court judge found Hampton guilty of both cases, found 
the repeat felony offender allegation in both cases true and sentenced Hampton 
to incarceration for forty years on each case to be served concurrently.
IV. Cruel and Unusual Punishment?
        While 
acknowledging that he was sentenced within the permitted punishment range, 
Hampton asserts that a sentence may still run afoul of the Eighth Amendment 
prohibition against cruel and unusual punishment.  See Solem v. Helm, 
463 U.S. 277, 290, 103 S. Ct. 3001, 3009 (1983).  He asserts that the 
proper analysis is to first determine if the sentence is grossly 
disproportionate to the offense and then, if found to be grossly 
disproportionate, to compare the sentence received to (1) sentences for similar 
crimes in the same jurisdiction, and (2) sentences for the same crime in other 
jurisdictions.  See McGruder v. Puckett, 954 F.2d 313, 316 
(5th Cir. 1992), cert. denied, 506 U.S. 849 (1992); Jackson v. State, 
989 S.W.2d 842, 845-46 (Tex. App.—Texarkana 1999, no pet).  Hampton also 
cites three Texas cases wherein he asserts similar conduct was punished with 
significantly shorter sentences.  See Tatum v. State, 649 S.W.2d 
139, 140 (Tex. App.—Fort Worth 1983, no pet.) (ten years for burglary of a 
habitation); Barrerra v. State, No. 14-02-041-CR, 2002 WL 31835063, *1 
(Tex. App.—Houston [14th Dist.] Dec. 19, 2002, no pet.) (not designated for 
publication) (eight years); Sullivan v. State, 975 S.W.2d 755, 756 (Tex. 
App.—Corpus Christi 1998, no pet.) (five years).  The State responds by 
distinguishing the cases cited by Hampton regarding shorter sentences for 
similar conduct, pointing out that in none of the cases cited is there evidence 
that the defendant had a prior felony conviction, that Hampton was charged with 
having committed two burglaries of a habitation with intent to commit 
aggravated assault with a deadly weapon, and that Hampton had engaged in a 
cocaine/hydrocodone/alcohol crazed course of terrorism against his wife and 
biological children including ramming his wife’s car with his own car and 
attempting to chase her with a baseball bat.  Having considered the 
foregoing, we cannot say that in any form or fashion that Hampton’s sentences 
of forty years are disproportionate to the conduct proven in this case, and 
hence cruel and unusual.
        The 
State also contends that Hampton failed to preserve error by not raising his 
disportionate sentencing argument to the trial court.  This court has been 
down this road before and held that this type of claim must be preserved by 
objecting at the trial court level.  Acosta v. State, No. 
2-03-258-CR, 2005 WL 503199, at *6 (Tex. App.—Fort Worth Mar. 3, 2005, no pet. 
h.); Sims v. State, Nos. 2-04-053 & 054-CR, 2004 WL 2792819, at *1 
(Tex. App.—Fort Worth Dec. 2, 2004, pet. filed ) (mem. op.) (not designated 
for publication); Bloch v. State, No. 2-03-363-CR, 2004 WL 2712149, at *3 
(Tex. App.—Fort Worth Nov. 24, 2004, no pet.) (mem. op.) (not designated for 
publication); Puckett v. State, Nos. 2-03-322 & 323-CR, 2004 WL 
915015, at *2 (Tex. App.—Fort Worth Apr. 29, 2004, no pet.) (mem. op.) (not 
designated for publication); Finney v. State, No. 2-02-034-CR, 2003 WL 
151972, at * 1 (Tex. App.—Fort Worth Jan. 23, 2003, pet. ref’d) (mem. op.) 
(not designated for publication).[2]   We 
further hold that Hampton waived this point and it is therefor overruled.
V. Conclusion
        After 
having overruled Hampton’s sole point, we affirm the judgments of the trial 
court.
  
  
                                                                  BOB 
MCCOY
                                                                  JUSTICE
 
  
PANEL 
A:   CAYCE, C.J.; DAUPHINOT and MCCOY, JJ.
 
CAYCE, 
C.J. concurs without opinion.
 
DO 
NOT PUBLISH
Tex. R. App. P. 47.2(b)
 
DELIVERED: 
June 9, 2005


NOTES
1.  
See Tex. R. App. P. 47.4.
2.  
But see Ray v. State, 119 S.W.3d 454 (Tex. App.—Fort Worth 2003, pet. 
ref’d).  A plurality of this court held that “[I]t is not clear to us 
whether this complaint of constitutional error [cruel and unusual punishment] 
may be raised for the first time on direct appeal.  We, therefore, shall 
address Appellant’s point in the interest of justice and, because the same 
complaint may be raised in a subsequent writ, at least in the guise of 
ineffective assistance of counsel, in the interest of judicial economy.”  
Id. at 459.  This main opinion was joined with two concurrences, one 
of which was with an opinion which would have held that the appellant in that 
case “waived his complaint of constitutional error based upon cruel and 
unusual punishment.”  Id.