**Opinion filed October 21, 2010**



In The

# Eleventh Court of Appeals

_____

## No. 11-09-00035-CR

_____

## LOWESTA T. HALLIBURTON, Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the Criminal District Court No. 4**

**Tarrant County, Texas**

**Trial Court Cause No. 1074680D**

## M E M O R A N D U M   O P I N I O N

The jury convicted Lowesta T. Halliburton of injury to an elderly individual by omission – serious bodily injury and assessed her punishment at confinement for life. We affirm.

### I. *Background Facts*

Investigator Ed Wright, with the North Richland Hills Police Department, was investigating an unrelated matter when he met with Richard Hoye in January 2007. Hoye was lying in bed and was covered with a dirty sheet. Hoye's bedroom had a foul stench, and Wright

could smell urine. Hoye appeared bedridden and in need of additional care. After their meeting, Investigator Wright contacted Adult Protective Services.

Adult Protective Services Specialist Chandra Wagner was asked to investigate. She went to Hoye's house in January. She did not notice any odors but thought that Hoye was disturbingly thin. Hoye said his caregiver, Halliburton, was taking good care of him. Hoye said that Halliburton took him to the doctor, did his grocery shopping, and was responsible for him. Hoye told Wagner that he did not have all of his medications but that he took the ones that he did have.

Wagner was concerned because of Hoye's appearance and was fearful that Hoye was not telling the truth because he did not want to get anyone into trouble. Wagner returned to Hoye's house with her supervisor in February. Halliburton was present. Halliburton said that she was Hoye's care provider, that she did not have a job because she had stopped working to take care of Hoye, and that they had lived together for twenty years. Wagner and her supervisor then spoke with Hoye. He told them that everything was fine.

Wagner was still concerned and she made a referral to CCAD, Community Care for the Aging and Disabled, so that a more thorough investigation could be performed and Hoye could receive any necessary services. Unfortunately, that referral "fell through the cracks." Wagner visited Hoye again in March and April. He continued to insist that everything was fine.

On May 21, 2007, at approximately 8:00 a.m., North Richland Hills paramedics were dispatched to Hoye's house. Hoye was found dead in his bedroom. He was extremely emaciated, was covered by a soiled blanket, and was wearing soiled underpants. Small insects and spiders were crawling around his mouth, eyes, ears, and nose. Hoye appeared to have a dried feces stain beneath him and a blood stain next to him. There were feces around his buttocks.

Halliburton identified herself as Hoye's spouse. She said that she had spoken with Hoye at 6:00 a.m. When she next checked on him, he had passed away. Halliburton later told a police officer that her daughter checked on Hoye at 6:00 a.m. and that she returned home at 7:25 a.m. and found that he had died.

Dr. Marc Krouse, Deputy Chief Medical Examiner for Tarrant County, performed an autopsy on Hoye. Hoye's body weight, clothed, was only sixty-nine pounds. Dr. Krouse determined that Hoye suffered from severe malnutrition and dehydration and that his starvation was caused by a deprivation of all calories. Dr. Krouse determined that Hoye was unable to take

care of himself and that he was deprived of food and water by others and ruled the manner of death as a homicide.

## II. *Issues*

Halliburton challenges her conviction with two issues. Halliburton contends that the evidence is legally and factually insufficient to support her conviction and that her sentence is disproportionate to the crime.

## III. *Discussion*

### A. *Is the Evidence Sufficient?*

The State alleged that Halliburton intentionally or knowingly caused serious bodily injury to Hoye by failing to feed him or give him sufficient water, by failing to obtain medical care, and by failing to make arrangements with a facility where he could obtain appropriate care. Injury to an elderly individual is a result-of-conduct offense. *Kelly v. State*, 748 S.W.2d 236, 239 (Tex. Crim. App. 1988). Thus, the State had to not only prove that Halliburton failed to act as alleged but that she intentionally or knowingly caused the injury. *Id.* Halliburton argues that the State failed to carry its burden of proof because Hoye had several medical problems such as a heart attack, COPD, and low weight, for which she cannot be blamed; because Adult Protective Services did not intervene on his behalf after multiple visits to his home; and because Hoye himself did not ask anyone for assistance.

#### 1. *Standard of Review.*

Halliburton challenges the legal and factual sufficiency of the evidence. The Texas Court of Criminal Appeals, however, recently held that legal sufficiency is the only standard that a reviewing court should apply. *Brooks v. State*, No. PD-0210-09, 2010 WL 3894613, at *1 (Tex. Crim. App. Oct. 6, 2010). To determine if the evidence is legally sufficient, we must review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979).

#### 2. *Failing to Feed.*

Halliburton claimed that Hoye ate three times a day and that she fed him oatmeal, soup, and cupcakes. This was contradicted by the medical evidence. Dr. Krouse testified that Hoye weighed only sixty-nine pounds. He was emaciated and had virtually no remaining muscle mass in any extremity because his body had started cannibalizing itself. Hoye's body had even started

cannibalizing his internal organs. His liver was only half its expected weight. Dr. Krouse could find no reason for the wasting except starvation and concluded that Hoye's diet had been severely restricted for weeks or months. The State introduced several pictures of Hoye's body. These pictures are reminiscent of a World War II concentration camp.

Not only was Halliburton's testimony at odds with the medical evidence, it was also refuted by an eyewitness. Brandon Westmoreland stayed at Hoye's home twice in 2006, and he lived there for three to four months in 2007. He testified that there was no cooking done in the house. There were some frozen or take-out pizza, but no other food in the house. Everyone went to fast-food restaurants. Westmoreland testified that Hoye was not fed three times a day. He saw food taken to Hoye a total of four times. Westmoreland was in jail at the time of trial for theft of property and failure to identify. Westmoreland's criminal issues provide reason to doubt his veracity, but the jury was entitled to believe his testimony. *See Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992) (the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony).

The medical evidence was unrefuted that Hoye starved to death because he was not properly fed. Hoye would have been bedridden for weeks or months and was, therefore, totally dependent upon Halliburton. Because he starved while in her care and because there was no evidence that she tried to regularly feed him, the evidence is sufficient to support the jury's determination that she intentionally or knowingly injured him.

### 3. Failing to Provide Water.

Dr. Krouse testified that Hoye was dehydrated. There was no water in Hoye's room. And there was no evidence that Halliburton or anyone else made any arrangements to provide Hoye with water. Because of his condition, Hoye was completely dependent upon Halliburton for water. The evidence is sufficient to support the jury's determination that Halliburton intentionally or knowingly injured Hoye by not providing him with water.

### 4. Failing to Provide Medical Care.

Dr. Geoffrey Barst, a family physician in North Richland Hills, was Hoye's physician. Dr. Barst first saw Hoye in 1998. At that time, Hoye was sixty-nine years old, was 6'1" tall, and weighed 130 pounds. When Dr. Barst saw him in 2003, he weighed only 108 pounds. Dr. Barst was concerned about his weight loss, and he recommended Ensure. Hoye told him that he was not being looked after very well because Halliburton had an outside job.

4

Hoye had other health problems besides low body weight. He smoked a pack a day, and he developed COPD. He had a heart attack in 2002, and he was admitted to Harris Methodist Hospital where he had a cardiac catheterization and a stent. Hoye was, therefore, in need of regular medical attention.

It was clear that Hoye did not like doctors. His first visit to Dr. Barst in 1998 was his first physical in forty years. When he had his heart attack, he waited several days after experiencing chest discomfort before going to the hospital. Halliburton told the police that Hoye refused to go to the hospital and that he did not want to go to the doctor. Hoye's last visit to Dr. Barst was in 2004. This was apparently his last visit to any doctor. Halliburton told the police that Hoye had not seen a doctor in the last two or three years. Investigator Michael Floyd with the Tarrant County Medical Examiner's Office testified that Dr. Barst told him that Hoye stopped coming because his insurance lapsed. Dr. Barst disputed that. Even if we assume that Dr. Barst was incorrect, Hoye still had Medicaid or Medicare, and he could have gone to John Peter Smith Hospital without charge. Even if Hoye did not like doctors, he was in need of regular medical attention. There is no evidence that Halliburton did anything to meet that need.

It was also clear that Hoye was not receiving all of his prescribed medication. In 2004, Hoye told Dr. Barst that he had run out of his inhaler and had borrowed someone else's. Dr. Barst prescribed an inhaler and oxygen therapy. When Wagner and her supervisor saw Hoye in February, Halliburton did not say anything about Hoye not having all of his prescribed medications. When the paramedics found Hoye's body, there were oxygen cylinders in his room but no cannula, and there were no regulators on any cylinder. Thus, Hoye was not receiving any oxygen therapy. Police found two inhalers and a small bottle of nitroglycerine in Hoye's room. Each of these had expired years previously.

The lack of care and attention Hoye received from Halliburton was also well chronicled by eyewitnesses. In 2007, Halliburton was living at her boyfriend's house. She would stop by in the morning when she dropped her youngest son off for school and sometimes came by on the weekends. In her absence, Hoye was attended by Halliburton's oldest two children who apparently only went in Hoye's room when he rang a bell. Halliburton claimed that she brought Hoye out of his room for a couple of hours a day in a wheelchair. However, the police saw no wheelchair in the house. To them, it appeared as though Hoye had not been out of his bed in some time. His body was soiled and was caked with dead skin and feces. He had redness and

irritation on every pressure point and had apparently been laying in the same spot for a long time. Westmoreland testified that the door to Hoye's room was never open and that he never saw a wheelchair in the house. Whether because Halliburton did not know or did not timely report is unclear, but Hoye had been dead more than twelve to fourteen hours when he was discovered by paramedics.

The jury had sufficient evidence from which to conclude that Halliburton intentionally or knowingly failed to obtain medical care for Hoye or to make arrangements with a facility where he could obtain appropriate care. Because the jury had sufficient evidence with which to conclude that Halliburton failed to feed Hoye, failed to provide him with water, and failed to provide him with medical care or a facility that could meet his needs, the evidence is legally sufficient to support Halliburton's conviction, and Issue One is overruled.

*B. Was Halliburton's Punishment Disproportionate to Her Crime?*

Halliburton acknowledges that punishment assessed within a statutory limit is generally not excessive, cruel, or unusual punishment and that her punishment was within the statutory limit. *Kirk v. State*, 949 S.W.2d 769, 772 (Tex. App.—Dallas 1997, pet. ref'd). She argues, however, that her sentence violates the Eighth Amendment because it is grossly disproportionate to the offense.[1] Texas courts have found that a prohibition against grossly disproportionate sentences survives under the federal constitution apart from any consideration of whether the punishment assessed is within the statute's range. *Delacruz v. State*, 167 S.W.3d 904, 906 (Tex. App.—Texarkana 2005, no pet.).

Texas courts have followed the Fifth Circuit's analysis for addressing Eighth Amendment proportionality complaints. *McGruder v. Puckett*, 954 F.2d 313 (5th Cir. 1992). This requires that we first conduct a threshold comparison of the gravity of the offense underlying the current conviction as well as the offenses underlying any prior convictions against the severity of the sentence. *Id.* at 316. The test is whether the sentence is grossly disproportionate to the gravity of the offenses upon which the sentences are based. *Winchester v. State*, 246 S.W.3d 386, 390 (Tex. App.—Amarillo 2008, pet. ref'd). We consider the gravity of the offense in light of the harm caused or threatened to the victim or society and the culpability of the offender. *Solem v. Helm*, 463 U.S. 277, 291-92 (1983).

---

[1]The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII.

Halliburton was previously convicted of burglary of a habitation, securing the execution of a document by deception, attempting to pass a forged writing, and forgery-possession. She also had pending charges for burglary of a habitation, credit card abuse, and theft. Halliburton correctly notes that these were only property crimes, but they evidence a pattern of criminal activity – a pattern that continued after Hoye's death.

Police found two life insurance policies on Hoye at Halliburton's boyfriend's house. The policies were for $10,000, and they named Hoye's ex-wife as beneficiary. Halliburton described them as burial policies. She said Hoye's ex-wife was deceased. In fact, Hoye's ex-wife was very much alive. Halliburton's intent was for the life insurance proceeds to go to the funeral home and then for any remainder to be sent to her. The trial court could reasonably conclude that Halliburton intended to convert Hoye's life insurance policies. The State also introduced a document that purported to deed Hoye's house to Halliburton. This document was in the possession of a longtime friend of Halliburton's, and it was witnessed by Halliburton and her oldest son. Not only were the circumstances surrounding the document questionable, but Halliburton's friend testified that he last saw Hoye in late April and that Hoye walked to the front door, opened it, and then walked back to his room and put his oxygen back on. The medical evidence indicates that Hoye was not being moved and that he was incapable of walking to the front door. He did not have the equipment to use his oxygen. The trial court could, therefore, reasonably conclude that Halliburton was also attempting to convert Hoye's house.

Hoye was allowed to starve to death in his own home because Halliburton was unwilling to provide him with basic staples such as food and water, to take him to the doctor, or to make arrangements with a facility that could provide for his needs. After he became bedridden, he was so abandoned by Halliburton that he developed bed sores on every pressure point, and he was allowed to lie in his own feces covered by a soiled blanket. After his death, Halliburton was apparently attempting to take advantage of his passing. Halliburton's sentence is not grossly disproportionate considering the gravity of her offense and her prior criminal history. Issue Two is overruled.

## IV. *Conclusion*

The judgment of the trial court is affirmed.


RICK STRANGE

JUSTICE


October 21, 2010

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.

8