

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-16-00386-CR

———————————————

CHASE KARRENBROCK, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 158th District Court
Denton County, Texas
Trial Court No. F15-927-158

Before Walker, Gabriel, and Pittman, JJ.
Memorandum Opinion by Justice Pittman

# MEMORANDUM OPINION

A jury convicted Appellant Chase Karrenbrock of first-degree burglary of a habitation (with intent to commit or an attempt to commit aggravated robbery), and the trial court sentenced him to sixty years' confinement. In six issues, Appellant appeals from his sentence and the denial of his motion for new trial. He complains that:

- The trial court violated his Eighth Amendment right to be free from cruel and unusual punishment by imposing a sixty-year sentence for a first felony offense involving no physical or bodily injury;

- The trial court abused its discretion by focusing on a post-indictment, pretrial incident involving Appellant to the exclusion of all other factors in evaluating whether Appellant's sentence was cruel and unusual;

- The trial court abused its discretion by failing to properly apply the modified *Solem* test adopted by the Texas Court of Criminal Appeals in *State v. Simpson* in evaluating Appellant's sentence;

- The trial court erred by failing to properly apply the modified *Solem* test adopted by the Texas Court of Criminal Appeals in *State v. Simpson*;

- The trial court violated Appellant's right to due process by considering the extraneous offense in determining his sentence; and

- The trial court violated Appellant's right to due process by tripling his sentence because of a single unadjudicated extraneous offense that carried a maximum one-year sentence.

Because we hold that the trial court did not err by sentencing Appellant to sixty years' confinement and that Appellant forfeited his due process complaints, we affirm the

trial court's judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.      Appellant Burglarizes the Home of Jonathan Jackamonis.**

On March 17, 2015, Appellant broke into the home of Jonathan Jackamonis looking for $60,000 that he believed was in the possession of Jonathon's son, Karl. Appellant planned the burglary with his friend, who told Appellant that Karl had posted on Facebook that he had taken the money from a drug dealer.  Karl had been living at his father's house, and Appellant's friend knew the address.  Unbeknownst to Appellant's friend, Jackamonis had kicked Karl out in February because he had "gotten in trouble with the law."

The day before the burglary, Appellant bought a gun at his friend's suggestion. To buy the gun, Appellant used money his step-grandfather loaned him to pay off credit card debt.  Originally, Appellant was going to drive the getaway car while his friend broke into the Jackamonis house to recover the money, but on the way to commit the crime, Appellant agreed to break in and search for the money because, unlike the friend, Karl did not know Appellant and therefore would not recognize him.

At the time of the burglary, Jackamonis was at home recovering from eye surgery.  Another son, Kurt, and Jackamonis's three-year-old granddaughter (his daughter's daughter) were both at home.  Kurt was in his room asleep.  Appellant entered the home through an open window in the kitchen.  When Jackamonis

3

discovered him, Appellant, holding a 9 mm pistol, ordered Jackamonis to take zip ties from Appellant and handcuff himself. Appellant forced Jackamonis to walk upstairs, past his granddaughter, to look for the money. Upstairs, Appellant went into Kurt's room, woke him, and, holding a gun to Jackamonis's head, told Kurt to zip tie his hands. Appellant then ordered Kurt to lie on his stomach and Jackamonis to lie on his stomach on top of Kurt, head to foot, while Appellant went through the house looking for the money. He told Jackamonis, "If I don't get my money, this is not going to end well."

Because Karl's door was locked, Appellant kicked the door open. Appellant ransacked the room looking for the money. He came out of Karl's room when Jackamonis started making sounds of pain from pressure in his eyes. Appellant asked Jackamonis what was wrong, and Appellant told him about his eye issues. Appellant asked what he could do, and Jackamonis told him he could take the zip ties off. Appellant told him he did not have anything with which to take them off, so at Jackamonis's suggestion, the two men went to the garage to get some cutters, which Appellant used to remove the zip ties. He then made Jackamonis return upstairs, and he instructed Jackamonis and Kurt to sit on a sofa on the second floor.

Appellant returned to searching the house for the money. When he failed to find it, he directed Jackamonis to call Karl. Jackamonis told Karl to "get home immediately," hoping that "with the inflection in [his] voice, . . . [Karl] would think that something was up." Karl told his father he was not coming. Appellant then

4

asked for any cash in the house, and Kurt told him that nobody keeps cash anymore. Finally, Appellant told Jackamonis, "I'm going to get out of your hair," and ordered Jackamonis and Kurt to stay in Karl's room. After allowing Jackamonis to go downstairs alone to get his granddaughter to bring her upstairs, Appellant left. Jackamonis then called 911. He and Kurt identified Appellant in separate photograph lineups, and Kurt then realized that he and Appellant had gone to high school and played sports together.

## II. A Jury Convicts Appellant of First-Degree Burglary, and the Trial Court Sentences Him to Sixty Years' Imprisonment.

The jury found Appellant guilty of committing burglary of a habitation with intent to commit or with an attempt to commit aggravated robbery and also found that he used or exhibited a deadly weapon—a firearm—during the commission of the offense. Appellant elected the trial court to determine his sentence.

During the punishment phase of the trial, the State put on evidence of an altercation Appellant had been involved in at a hotel while he was on bond awaiting trial. Appellant and a friend were playing music loudly at the hotel basketball court. Members of the Krech family—nine adults and six children—were at the hotel pool next to the basketball court. Kevin Krech testified that when his sister-in-law asked Appellant to turn the music down, he replied, "Why don't you tell your F'ing husband to come over here and make me turn it off?" After complaints by Krech family members, a hotel manager instructed Appellant and his friend to turn down the

music, and they complied. When Kevin and Randy, one of his brothers, walked past the basketball court a short time later, Appellant "started saying, Hey, do you guys got a problem? You got a problem? You want to go?" When Keven and Randy said no, Appellant said, "That's what I thought, you F'ing p-u-s-s-i-e-s." Randy responded to Appellant, "Hey, what's your problem?" Appellant then "power walk[ed] with his arms up in a very aggressive manner" toward Randy. When Appellant reached Randy, Randy punched him in the face. Kevin jumped on Appellant's friend to hold him back because he "[didn't] want to see [his] brother get . . . beat up by two people." After people pulled Kevin off Appellant's friend, the friend punched Randy in the face, cracking his nose. Appellant got up and "was in [Kevin's] wife's face," and then "grabbed her by the hand and swung her" while she was holding her thirteen-month-old child. After everyone "got more separated," Appellant said he was going to get his gun out of his car and kill everybody. The Kreches announced they were calling the police, and Appellant and his friend left before the police arrived. Appellant dropped his cell phone during the altercation, the Kreches gave it to the Addison police, and Addison police contacted Denton County after discovering that Appellant's trial in this case was pending.

In announcing the sentence, the trial court stated that Appellant "had plenty of time during the planning to realize just how far gone [he was] . . . . [He] had to go and buy a gun to even have one to take . . . . And then while [he was] out on bond, [he]

faced off with people. And I could have considered 20, 30 years, but I've got to protect everybody." The trial court sentenced Appellant to sixty years' confinement.

## III. The Trial Court Denies Appellant's Out-of-Time Motion for New Trial After a Hearing.

The trial court sentenced Appellant in open court on September 29, 2016. Appellate counsel was appointed eleven days later, and he requested the clerk's record three days later. The clerk's record was not filed with this court until November 18, 2016. In May 2017, Appellate counsel filed a plea in abatement in this court. Because the plea in abatement contained at least one "facially plausible claim" of ineffective assistance of counsel, which he was unable to present to the trial court in a motion for new trial or to preserve for appellate review due to his late appointment and the filing of the appellate record after the deadline for filing a motion for new trial had elapsed, we granted the plea in abatement in part, abated the appeal, and remanded the case to the trial court to the point when sentence was imposed and from which point appellate counsel could file a motion for new trial within the appellate timetables. We specified that the motion for new trial be limited to the punishment-disproportionality claim identified in the plea in abatement. *Karrenbrock v. State*, No. 02-16-00386-CR (Tex. App.—Fort Worth June 20, 2017, abatement order).

At the hearing on Appellant's newly filed motion for new trial, the trial court reaffirmed the sixty-year sentence and noted that the court had weighed "everything" including the "preparation that went into this [crime], the planning, the diabolical

7

nature of its execution, all the different indicators that were there that tell me that if the victims of this had slipped up, they'd be dead people." Finally, the trial court noted Appellant's "meanness of spirt and apparent viciousness" with respect to the incident that occurred when he was on bond before trial.

## DISCUSSION

### I. Appellant Forfeited His Issues Alleging Violations of His Due Process Rights by Not Raising Those Complaints in the Trial Court.

In his fifth issue, Appellant contends that the trial court violated his rights to due process by considering the extraneous offense in determining his sentence. In his sixth issue, Appellant contends that the trial court violated his rights to due process by "tripling" his sentence based on "a single unadjudicated extraneous offense that carried . . . a maximum 1-year sentence." Appellant did not raise these complaints in the trial court at any time.

Constitutional errors may be forfeited by the failure to raise them in the trial court. *See Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). Because Appellant did not raise his due process complaints in the trial court, he has failed to preserve them for review. *See id.* at 340; *Benson v. State*, 224 S.W.3d 485, 498 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding the defendant forfeited his sentencing complaints by failing to raise them in the trial court). We overrule Appellant's fifth and sixth issues.

8

**II.    The Trial Court Did Not Violate Appellant's Eighth Amendment Right to Be Free from Cruel and Unusual Punishment by Imposing a Sixty-Year Sentence.**

In his first issue, Appellant contends that the trial court violated his Eighth Amendment right to be free from cruel and unusual punishment by imposing a sentence of sixty years' confinement "for a first felony offense involving no physical or bodily injury."

**A.    We Review the Trial Court's Punishment Decision for an Abuse of Discretion, and Sentences Falling Within the Statutory Range of Punishment Generally Do Not Violate the Eighth Amendment.**

A trial court has "wide latitude" in sentencing. *Tapia v. State*, 462 S.W.3d 29, 46 (Tex. Crim. App. 2015). In fact, a trial court's discretion to sentence an offender to a punishment within the statutory range of punishment is "essentially unfettered." *Ex parte Chavez*, 213 S.W.3d 320, 323 (Tex. Crim. App. 2006) (internal quotation marks omitted). We will not reverse a trial court's punishment decision absent a harmful abuse of that discretion. *Jackson v. State*, 680 S.W.2d 809, 814 (Tex. Crim. App. 1984); *Shivers v. State*, No. 02-16-00387-CR, 2017 WL 6884303, at *4–5 (Tex. App.—Fort Worth Oct. 19, 2017, pet. ref'd). Typically, a sentence within the statutory range of punishment is not excessive, cruel, or unusual under the Eighth Amendment, and we will not disturb it on appeal. *State v. Simpson*, 488 S.W.3d 318, 323 (Tex. Crim. App. 2016) (citing *Chavez*, 213 S.W.3d at 323–24).

**B. A Sentence Within the Statutory Range of Punishment Must Also Be Proportional to the Crime.**

However, even a sentence falling within the statutory range of punishment must be proportional to the crime. *Solem v. Helm*, 463 U.S. 277, 290, 103 S. Ct. 3001, 3009 (1983). Thus, a "very limited, exceedingly rare, and somewhat amorphous" exception exists to the general rule for sentences that fall within the statutory range of punishment but are nevertheless grossly disproportionate to the offense. *Chavez*, 213 S.W.3d at 323–24 (internal quotation marks and footnote omitted). As the Texas Court of Criminal Appeals recently reiterated in *Simpson* when discussing the modified *Solem* test we apply in Texas:

> An allegation of disproportionate punishment is a valid legal claim. The concept of proportionality is embodied in the Constitution's ban on cruel and unusual punishment and requires that punishment be graduated and proportioned to the offense. But, this is a narrow principle that does not require strict proportionality between the crime and the sentence. Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime. . . .

> To determine whether a sentence for a term of years is grossly disproportionate for a particular defendant's crime, a court must judge the severity of the sentence in light of the harm caused or threatened to the victim, the culpability of the offender, and the offender's prior adjudicated and unadjudicated offenses. In the rare case in which this threshold comparison leads to an inference of gross disproportionality, the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. If this comparative analysis validates an initial judgment that the sentence is grossly disproportionate, the sentence is cruel and unusual.

> Only twice has the Supreme Court held that a non-capital sentence imposed on an adult was constitutionally disproportionate. . . .

488 S.W.3d at 322–24 (citations omitted).

Along with "prior adjudicated and unadjudicated offenses," when performing the threshold disproportionality analysis, our sister courts have also considered a defendant's offenses or bad acts while on bond. *See, e.g.*, *Alvarez v. State*, 525 S.W.3d 890, 893 (Tex. App.—Eastland 2017, pet. ref'd) (noting that the trial court heard testimony that the defendant "reoffended upon subsequent release on bond"); *Gray v. State*, No. 04-12-00244-CR, 2012 WL 5507106, at *2 (Tex. App.—San Antonio Nov. 14, 2012, no pet.) (mem. op., not designated for publication) (noting that defendant's "bond pending his trial for the instant offense was revoked after he tested positive for use of marihuana"); *Leflore v. State*, No. 07-10-00295-CR, 2010 WL 5128784, at *2 (Tex. App.—Amarillo Dec. 16, 2010, no pet.) (mem. op., not designated for publication) (noting defendant tested positive for drugs while on bond).

### C. There Is No Inference that Appellant's Sentence is Grossly Disproportionate.

Appellant's sixty-year sentence is well within the statutory range of punishment for a first-degree felony. *See* Tex. Penal Code Ann. § 12.32 (West 2011) (setting a first-degree felony's range of punishment at five to ninety-nine years' confinement and a fine of up to $10,000). We therefore consider the gross-disproportionality threshold factors—the harm caused or threatened to Jackamonis, Appellant's culpability, and Appellant's other adjudicated and unadjudicated offenses. *See Simpson*,

488 S.W.3d at 323; *Alvarez*, 525 S.W.3d at 893; *Gray*, 2012 WL 5507106, at *2; *Leflore*, 2010 WL 5128784, at *2.

Appellant did not take anything from the home, but the burglary with the underlying attempted or intended aggravated robbery nevertheless affected the Jackamonis family. Jackamonis testified that

- He felt helpless and angry during the burglary because his son and granddaughter were also in the home;

- He relives the experience every day;

- The burglary "profoundly changed [his family's] lives";

- The home now has an alarm system and cameras; and

- Almost everyone in the home has a concealed handgun license or is in the process of getting one and "is always walking around armed."

Kurt Jackamonis testified that he had been scared for his family and himself during the burglary. Because Appellant had pointed a gun at them, he had been afraid someone could die.

The trial court discussed Appellant's culpability before sentencing him:

I'll give a little bit of explanation. Reasonable and fair, you don't go to a house with a gun, zip ties, what appeared to be black duct tape and rubber gloves with the expectation that it's empty. And when you realize it's not empty, you still enter.

I have some serious doubts as to some of the things that you told the police when they interrogated you. And the only person's word we have where you're walking around with a gun that didn't have a round chambered is yours. And I don't believe that. I'd have never thought of having father and son stacked one on top of the other, face to toes. You had plenty of time during the planning to realize just how far gone you

were. You had plenty of time. You had to go and buy a gun to even have one to take with you.

And then while you're out on bond, you face off with people. And I could have considered 20, 30 years, but I've got to protect everybody and that's just—so taking everything into consideration, everything that I've heard, drawing reasonable inferences from the evidence, the evidence that was admitted—and, again, I'm not—I feel horrible for your grandparents. I feel horrible for them. I feel horrible for the families. I really, really hate my job. Because I think it diminishes every single one of us at a certain point, but I have to protect everybody. So I'm sentencing you to 60 years.

Finally, Appellant had a prior conviction for possession of marihuana of less than two ounces and pending charges of evading arrest, but most significantly, while out on bond in this case and only a few months before trial, he again threatened gun violence and again placed a young child in danger—this time a thirteen-month-old child held in its mother's arms as he grabbed the mother and swung her by the hand after a physical altercation with her husband.

Considering the evidence of all three factors, we hold that this is not one of those "rare" cases in which gross disproportionality can be inferred. *See Simpson*, 488 S.W.3d at 323; *Bradley v. State*, No. 08-15-00035-CR, 2018 WL 1325154, at *5 (Tex. App.—El Paso Mar. 15, 2018, no pet.) (not designated for publication); *Alvarez*, 63 S.W.3d at 581. We therefore have no need to compare Appellant's sentence with sentences received by other offenders in Denton County or with sentences imposed on others committing first-degree burglary of a habitation in other jurisdictions. *See Simpson*, 488 S.W.3d at 323; *Alvarez*, 63 S.W.3d at 581; *Bradley*, 2018 WL 1325154, at

*5. We hold that Appellant's sentence does not violate the Eighth Amendment, and we overrule his first issue, which is dispositive.

## III. The Trial Court Did Not Abuse Its Discretion by Denying Appellant's Motion for New Trial.

Appellant's remaining three issues (Issues 2, 3, and 4) challenge the trial court's application of the modified *Solem* test in denying Appellant's motion for new trial. Because we performed our own modified *Solem* test and upheld Appellant's sentence, we hold that the trial court did not abuse its discretion by denying Appellant's motion for new trial. *See State v. Herndon*, 215 S.W.3d 901, 905 n.4, 906–07 (Tex. Crim. App. 2007). We overrule Appellant's second, third, and fourth issues.

## <u>CONCLUSION</u>

Having overruled Appellant's six issues, we affirm the trial court's judgment.

/s/ Mark T. Pittman
Mark T. Pittman
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: October 25, 2018

14