

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-21-00006-CR

_____

LADARRIN DEONTRE STEWART, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 124th District Court
Gregg County, Texas
Trial Court No. 48029-B

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Burgess

## MEMORANDUM OPINION

On December 13, 2018, LaDarrin Deontre Stewart pled guilty to two counts of aggravated robbery and was placed on eight years' deferred adjudication community supervision. After the State filed multiple applications for adjudication of guilt, on October 16, 2020, the trial court found Stewart guilty of two counts of aggravated robbery and sentenced him to twenty years' confinement in prison. On appeal, Stewart contends that (1) the trial court reversibly erred when it failed to consider the full range of punishment and (2) the trial court's failure to consider the full range of punishment violated the Eighth Amendment to the United States Constitution and Article I, Section 13, of the Texas Constitution. For the reasons below, we affirm the trial court's judgment.

## I.     Background

On December 13, 2018, Stewart pled guilty to two counts of aggravated robbery. Although the penalty range for aggravated robbery is anywhere from five years to ninety-nine years or life in prison, the trial court placed Stewart on deferred adjudication community supervision (community supervision). As conditions of his community supervision, Stewart agreed, among other things, that he would (1) commit no new criminal offenses, (2) refrain from possessing or using illegal drugs or alcohol, (3) successfully complete 384 hours of community service, (4) pay restitution to the victims in the amount of $1,720.00, (5) attend and complete drug and alcohol counseling and theft prevention class, and (6) pay court costs in the amount of $249.00.

On April 1, 2019, the State filed its first application for adjudication of guilt alleging, among other things, that Stewart had violated the terms and conditions of his community supervision by (1) using illegal drugs, (2) attempting to alter or falsify a urinalysis test, (3) failing to complete his community service, (4) failing to pay supervision fees, (5) failing to pay restitution, and (6) failing to pay a variety of court costs and fees. On June 24, 2019, the trial court held a hearing on the State's application to adjudicate. Stewart entered pleas of true to the State's allegations against him. The trial court took judicial notice of Stewart's court file and his pre-sentence investigation report (PSI).

Kindell Whitley, a Gregg County adult probation officer, testified that Stewart was under her supervision and that his progress "ha[d] been about average." Although Stewart's PSI indicated that he did not have a substance abuse problem, Whitley believed that he did. Whitley explained that Stewart told her that, at various times, he had used marihuana, Xanax, and codeine in a cough syrup mixture. According to Whitley, Stewart used illegal drugs until he was confined in jail in July 2018. Whitley stated that Stewart also attempted to falsify his urinalysis test. It was Whitley's opinion that Stewart had not taken responsibility for his role in the two counts of aggravated robbery. Further, Stewart "ha[d] not done a single hour of community service" and had paid no restitution. Whitley also stated that Stewart registered for the theft prevention class that he was required to take, but he failed to complete it. Likewise, he failed to participate in alcohol and drug education classes.

In addition, Whitley explained that Stewart had been on juvenile probation for a conviction of burglary of a vehicle. Whitley had also been on adult supervision for a prior

3

misdemeanor resisting arrest conviction, but he did not successfully complete it. Instead, his supervision was revoked, and Stewart had been given jail time instead. In addition, Stewart had been convicted of misdemeanor thefts and criminal trespass. Despite that, Whitley recommended that Stewart be placed in a Substance Abuse Felony Punishment Facility (SAFPF) so that he could get help for his substance abuse issues.

Stewart testified that his marihuana use was due to his "struggl[es] trying to find a job." He stated, "I was trying to take care of my household by myself because my girlfriend didn't have a job at the time. So it was kind of hard on me but I was trying." Stewart conceded that he had used marihuana and "some other things" on a daily basis. He also admitted that he began using drugs at a young age and that he was aware he had a drug problem. When asked about falsifying his urine test, Stewart said, "I was taking antibiotics. I had a toothache at the same time. You know, there's no reason I should have been smoking. I know I wasn't supposed to be smoking." According to Stewart, it was difficult for him to do his community service because he was working and "paying the bills and everything." Yet, he followed with, "It don't make no excuse, I could have did -- this come first." Stewart explained that, if he was given a second chance, he would turn to his family in the event he began to have issues. He stated, "I would do anything to keep me free. Yes, sir, I would."

After both sides presented their witnesses, Stewart asked the court to continue him on community supervision and to allow him to go to the SAFPF. The State argued that Stewart pled guilty to aggravated robbery, that it was one of the most serious offenses he could have committed, and that a SAFPF would be of little assistance to Stewart because the charged

4

offense did not involve drug or alcohol addiction. The trial court took a brief recess to consider its ruling. When the court returned, it found the State's allegations against Stewart to be true. The trial court then reminded Stewart that he had not taken complete responsibility for his actions. The following exchange took place:

> THE COURT: But, Mr. Stewart, I want you to remember the words of [State's Counsel].
>
> MR. STEWART: Yes, sir.
>
> THE COURT: Because if you come back and it's to the point where I have to revoke your probation -- and I'll be honest with you, normally if somebody goes to SAFPF it gives them extra chances, you will not.
>
> MR. STEWART: Yes, Sir.
>
> THE COURT: Your history, you're [sic] pitiful performance thus far dictates that you need to dot your I's and cross your T's. Because otherwise I have very little choice next time -- if it justifies revocation you're probably looking at 20–25 years. I'm not going to recite today what went through those kids' minds that you robbed, but if I ever get to that point, I'm going to justify it for the Court of Appeals so that they know that you deserve every day that I give you if I have to do that. I'm giving you a chance today. Now you take advantage of it. What you do with it is up to you. I can't make you take advantage of it, only you can. Now you have all the tools, but the first thing you have to start with is honesty and responsibility. You pled true today. I give you credit for that, but there's still a lot of denial. Now, as I told you the day you pled guilty in front of me you pled guilty to aggravated robbery as a party. I don't ever want to hear again -- next time your mom asks you what happened, you tell her the truth. Next time your probation officer asks you, you tell them the truth. I don't want to hear this, "Well I really didn't do it. I was just there in the wrong place wrong time."
>
> MR. STEWART: Yes, sir.
>
> THE COURT: Because otherwise you're going to be at the wrong place at the wrong time for 20 to 25 years; am I clear?
>
> MR. STEWART: Yes, sir.

5

. . . .

THE COURT: Now, I will modify you and send you to SAFPF. But, again, you cannot just sit on your butt and do nothing. You have to be actively involved in your rehabilitation. If you're not, you can be there six months, if they kick you out, I will give you zero days credit.

MR. STEWART: Yes, sir.

THE COURT: Also you have been in our jail since April the 10th and until you go to the SAFPF all of that time is condition of probation time. That means if I ever have to revoke your probation, you don't get credit for a day. So I'm marking that as COP time.

MR. STEWART: Thank you.

THE COURT: Now, Mr. Stewart, it's time to grow up.

MR. STEWART: Yes, sir.

THE COURT: You've sat here and told me you want to be a father to your child. It starts now.

MR. STEWART: Yes, sir.

THE COURT: No more excuses. No more marijuana. No more, "Well, I was stressed so couldn't do community work service." No. I expect strict compliance with this.

MR. STEWART: Yes, sir.

THE COURT: I am taking a huge chance. Don't make me regret it. Because like I said, what Mr. Guy said is right, what you deserve. He's probably low on that number.

MR. STEWART: Yes, sir.

THE COURT: The first number is probably correct. But you're probably looking at 20 to 25. That means ten to twelve and a half years before parole will even look at your file.

MR. STEWART: Yes, sir.

6

THE COURT: And based on their juvenile and adult history, I'll tell you this, they probably won't look at it for those first few times. A 25-year sentence probably means you serve 15 to 17 years. Think about that. Your child will be grown and won't know you. So you -- I'm giving you an opportunity, but I'm also letting you know there are definite and real consequences. I'm sure your attorney tells you about the notes I take on my PSI and the notes I'll have in the file if and when you come back before me. Do you understand?

MR. STEWART: Yes, sir, I do. Thank you.

THE COURT: This is your last chance. Take advantage of it.

After admonishing Stewart, the trial court continued Stewart's community supervision, required that he participate in treatment at a SAFPF, and extended his community supervision term to ten years. In July 2019, Stewart began his stay at the SAFPF; however, he was subsequently discharged as a result of fighting.

On January 28, 2020, the trial court entered another order modifying conditions of community supervision, which allowed Stewart to return to the SAFPF. It also stated,

Immediately upon release from SAFPF, the defendant shall submit to custodial supervision in a Transitional Treatment Center or participate in the 4C Program if qualified. The defendant shall cooperate fully with all treatment program requirements, comply with all rules and regulations and remain in the facility or program until successfully discharged by the treatment center staff with the concurrence of the Gregg County SAFPF coordinator.

On October 16, 2020, the State filed another application for adjudication of guilt, alleging that Stewart violated the terms and conditions of his community supervision by failing to comply with all the rules and regulations of the transitional treatment center, that is, being caught with Benadryl tablets on August 22, 2020, and a cell phone on October 14, 2020. The State also

7

alleged that Stewart was unsuccessfully discharged from the transitional treatment center on October 15, 2020.

A hearing was held on December 16, 2020, and Stewart pled true to the State's allegations. The State offered the stipulation of evidence, and the trial court considered the contents of the court's file, including Stewart's performance during the time he was in the SAFPF, Stewart's SAFPF progress reports, Stewart's PSI, and the offense report relating to the aggravated robbery, without objection.

According to Stewart, he had successfully completed the SAFPF program in eleven months, and upon its completion, he began transitional treatment and lived in a halfway house. Stewart explained that he did not have a bottle in which to keep the Benadryl tablets, so he kept them in his inhaler, and claimed that he did not know he was prohibited from having Benadryl in the transitional treatment center. According to Stewart, he had only been in possession of the Benadryl because he was allergic to fish and never intended to "abuse" the drug.

In relation to the cell phone allegation, Stewart said, "The reason I had the cell phone -- I mean, it's no reason. I had -- they – the -- I'm holding myself accountable for having the phone at the facility, but my mother had got sick with COVID." According to Stewart, he had only two weeks left before completing the transitional treatment program, and his counselor indicated that he only wanted Stewart to "do two weeks' shutdown."

Despite the alleged infractions, Stewart said he was aware that, when a person is on community supervision, he must abide by strict rules. If the trial court were to give Stewart another opportunity to complete probation, Stewart claimed that "[he] ha[d] no doubt in [his]

mind that [he could] complete probation successfully and -- and go[] to the halfway house." He continued, "Whatever I've got to do to get on probation again and do what I'm supposed to do, I can do it." Stewart claimed, "It's not hard. I mean, I done changed."

Stewart's mother, Pauliszia Stewart, testified that she had tested positive for COVID in September 2020 and had been hospitalized. Pauliszia explained that, because Stewart's community supervision officer would not allow him to care for her in person, Stewart obtained a cell phone so he could stay in touch with her. Pauliszia said that she did not have a problem with Stewart and Stewart's son living with her after he left the halfway house. According to Pauliszia, she had a close relationship with Stewart, and he always treated her with respect. Pauliszia explained that Stewart was allergic to fish, eggs, and wood, and that he needed the Benadryl for his allergies. She also said that the county was aware of his problem with allergies. Finally, Pauliszia asked the court to allow Stewart to remain on community supervision and, according to her, this time Stewart would comply with the supervision conditions.

Stewart's grandmother, Annie Jackson, testified that she had been a part of Stewart's life "since the day he was born . . . ." Jackson stated that, since Stewart had been on community supervision, he had grown as a person. In her opinion, Stewart could be a productive and law-abiding citizen. Jackson asked the trial court to allow Stewart to remain on community supervision, and she assured the court that she would see to it that Stewart attended church while on supervision.

Alexandria Green, Stewart's fiancée and the mother of his child, testified that they had been together for six years. According to Green, they had a great relationship, but Stewart would

not be able to reside with her when he left the halfway house because she had a criminal history. Green said that, because she had been on community supervision in the past, she believed that she knew what it took to be successful on it and that she would help Stewart in any way she could. Green said that Stewart had been a "great father ever since the first day [she] told him." Green asked the trial court to give Stewart another opportunity to complete community supervision because her son "needed his daddy."

During closing arguments, Stewart maintained that he could be a productive and law-abiding citizen, and he asked the court to give him another chance to complete community supervision. The State reminded the court that Stewart had been given several chances to "turn[] over a new leaf" and that he repeatedly told the court that he would follow the terms and conditions of community supervision, but then failed to do so.

The court explained that it would be taking the case under advisement for a few minutes and would return to the courtroom to announce its ruling. Upon its return, the court initially reiterated Stewart's entire history, including the facts that made up the initial charges and the multiple mistakes that Stewart had made after he was placed on deferred adjudication community supervision. The court also indicated that it did not believe some of Stewart's testimony regarding some of the alleged violations. The court explained, in part, as follows:

> And so here we are a third time -- or a fourth time now, in front of me, asking for another chance.
>
> This Court has never shied away from giving offenders multiple chances. But factors that the Court has to consider is the type of violations, the history of violations, but also the type of case. I may be a little more tempted to show continued mercy if it had been a burglary case that we're here on or possession of

10

controlled substance. But what we are here on is not that. We are here on an aggravated robbery.

. . . .

Based on the history, your criminal history, the history of this case, I have no choice. I will adjudicate you guilty of Count I and Count II, aggravated robbery. And I will assess the punishment that the State requested the last time we were here, on each count, of 20 years' confinement in the Institutional Division of the Texas Department of Criminal Justice, and I will give you credit for any and all time you have served.

This appeal followed.

## II.     Discussion

### A.     The Trial Court Did Not Fail to Consider the Entire Range of Punishment

In his first point of error, Stewart contends that the trial court committed systemic, constitutional, reversible error by failing to consider the entire range of punishment. According to Stewart, the trial court did not consider any punishment other than twenty years' confinement in prison because of the statements it made during the June 24, 2019, hearing on the State's first motion to adjudicate guilt. Stewart claims that "the trial court simply lived up to its 'promise' to assess at least twenty years." We disagree.

The constitutional mandate of due process requires a neutral and detached judicial officer who will consider the full range of punishment. *Gagnon v. Scarpelli*, 411 U.S. 778, 786–87 (1973). A trial court denies due process when it arbitrarily refuses to consider the entire range of punishment for an offense or refuses to consider mitigating evidence and imposes a predetermined punishment. *Ex parte Brown*, 158 S.W.3d 449, 454 (Tex. Crim. App. 2005) (per curiam). In the absence of a clear showing to the contrary, we presume that the trial court

11

was neutral and detached. *Fielding v. State*, 719 S.W.2d 361, 366 (Tex. App.—Dallas 1986, pet. ref'd) (citing *Thompson v. State*, 641 S.W.2d 920, 921 (Tex. Crim. App. [Panel Op.] 1982), *disagreed with on other grounds by Estep v. State*, 901 S.W.2d 491 (Tex. Crim. App. 1995)).

Contrary to Stewart's contention, the record does not show that the trial court failed to consider the entire range of punishment. Rather, the record shows that the court gave Stewart several chances to successfully complete deferred adjudication community supervision. The trial court's prior comments relating to the imposition of twenty to twenty-five years' confinement in prison do not amount to a refusal to consider the entire range of punishment. Instead, the court was emphasizing the importance of Stewart's strict adherence to the conditions of his community supervision, and it did so repeatedly. Moreover, in the final hearing, the court indicated that it might have been more amenable to considering a lesser punishment but for the fact that Stewart had been before the court on several other occasions for violating the conditions of his community supervision. It explained that, on those previous occasions, Stewart had assured the court that he was aware of, and understood, the terms and conditions of his community supervision and that he would successfully comply with them. Stewart's pleas of true to the State's allegations showed otherwise.

Further, the court stressed the nature of the underlying offense, and it explained that, had the charged offense been of a different nature—one that did not involve multiple victims and a semi-automatic weapon—it might have been more inclined to assess a lesser punishment. Moreover, the trial court heard mitigating testimony from Stewart, his mother, his grandmother, and his fiancée. The court also considered Stewart's prior criminal history, his performance

during the time he was in a SAFPF, Stewart's SAFPF progress reports, Stewart's PSI, and the offense report relating to the aggravated robbery. Because the record does not show that the trial court failed to consider the entire range of punishment, we overrule Stewart's first point of error.

**B.      Stewart's Sentence Was Not Disproportionate**

Next, Stewart contends that his twenty-year sentence was disproportionate and violated his rights under the Eighth Amendment to the United States Constitution and Article I, Section 13, of the Texas Constitution. We disagree.

Texas courts have traditionally held that, as long as the punishment assessed is within the range prescribed by the Legislature in a valid statute, the punishment is not excessive, cruel, or unusual. *See Jordan v. State*, 495 S.W.2d 949, 952 (Tex. Crim. App. 1973). Aggravated robbery is a first-degree felony. TEX. PENAL CODE ANN. § 29.03(b). As such, it carries a punishment range of anywhere from five years to ninety-nine years or life in prison and a fine up to $10,000.00. TEX. PENAL CODE ANN. § 12.32. After finding Stewart guilty of two counts of aggravated robbery, the trial court sentenced him to twenty years' confinement in prison, punishing him well within the statutory sentencing range. Stewart has not shown that his sentence was excessive, cruel, or unusual in violation of the Texas Constitution.

Yet, a prohibition against grossly disproportionate punishment survives under the Eighth Amendment to the United States Constitution apart from any consideration of whether the punishment assessed was within the range established by the Legislature. *See Jackson v. State*, 989 S.W.2d 842, 845 (Tex. App.—Texarkana 1999, no pet.). The appropriate proportionality analysis under both the Eighth Amendment to the United States Constitution and Article I,

13

Section 13, of the Texas Constitution is guided by (1) "the gravity of the offense compared and the harshness of the penalty," (2) "the sentences imposed on other criminals in the same jurisdiction," and (3) "the sentences imposed for commission of the same crime in other jurisdictions." *Solem v. Helm*, 463 U.S. 277, 292 (1983); *Simmons v. State*, 944 S.W.2d 11, 15 (Tex. App.—Tyler 1996, pet. ref'd). Notably, only if the initial comparison creates an inference that the sentence is grossly disproportionate to the offense should there be a consideration of the last two *Solem* factors. *McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir. 1992); *Mullins v. State*, 208 S.W.3d 469, 470 (Tex. App.—Texarkana 2006, no pet.). A sentence is grossly disproportionate to a crime only when an objective comparison shows the sentence to be extreme. *Harris v. State*, 204 S.W.3d 19, 29 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). It is the defendant's burden to show that his sentence is grossly disproportionate. *Meadoux v. State*, 325 S.W.3d 189, 196 (Tex. Crim. App. 2010).

Stewart's sentence of twenty years' confinement in prison was at the lower end of the first-degree felony punishment range, and the State presented evidence that included the extreme gravity of the offense, his prior criminal history, and his repeated opportunities to successfully complete his term of deferred adjudication community supervision. We have reviewed the record and find nothing to indicate that Stewart's sentence was grossly disproportionate to his offense.[1] Accordingly, we find that Stewart's twenty-year sentence was not in violation of constitutional standards.

We overrule his second point of error.

---

[1]Because Stewart's sentence was not grossly disproportionate to his offense, it is unnecessary for us to consider the remaining two *Solem* factors.

### III.      Conclusion

We affirm the trial court's judgment.

Ralph K. Burgess
Justice

Date Submitted:      July 20, 2021
Date Decided:        September 9, 2021

Do Not Publish